RECEIPT # 63641
AMOUNT $ 252
SUMMONS ISSUED Y I
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK. __
DATE 4/19-05

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUECHIP TECHNOLOGIES LTD.,

Plaintiff,

v.

HCA INFORMATION TECHNOLOGY &
SERVICES, INC.,

Defendant.

Civil Action No. _____

**COMPLAINT AND
JURY DEMAND**

05 - 10784 JLT

MAGISTRATE JUDGE _____

Plaintiff BlueChip Technologies Ltd. ("BlueChip"), for its Complaint herein alleges,

upon personal knowledge as to its own actions and upon information and belief as to the actions

of defendant and others, as follows:

### NATURE OF ACTION

1.      BlueChip, a leading developer of electronic forms automation, document imaging,

and object archiving solutions for the medical marketplace, brings this action for injunctive relief

and damages to redress the willful and improper conduct of defendant HCA Information

Technology & Services, Inc. ("HCAIT").

2.      HCAIT has engaged in a pattern of wrongful and deceptive conduct with regard

to BlueChip, including breaching a software licensing contract between BlueChip and HCAIT,

directly infringing BlueChip's software copyrights, contributorily infringing BlueChip's

software copyrights by inducing others to infringe, and engaging in unfair trade practices in

violation of the laws of the Commonwealth of Massachusetts.

## PARTIES

3.     BlueChip Technologies Ltd. ("BlueChip") is a corporation organized and existing under the laws of the Commonwealth of Massachusetts with its principal place of business located at 24 Cherry Hill Drive, Danvers, Massachusetts. BlueChip has been in the business of developing, marketing, and supporting software solutions since approximately 1993.

4.     HCA Information Technology & Services, Inc. ("HCAIT") is a corporation organized and existing under the laws of the State of Tennessee with its headquarters located at 2545 Park Plaza, Nashville, Tennessee. HCAIT is a wholly owned subsidiary of HCA, Inc., ("HCA").

5.     HCA is a for-profit, publicly traded corporation which owns over a hundred hospitals across the United States and Europe. HCA is headquartered at One Park Plaza, Nashville, Tennessee.

6.     The business of HCAIT is to provide information technology and services to HCA-owned and non-affiliated healthcare enterprises. HCAIT provides information technology and services to its customers through a number of large "Data Centers" each of which provides end user healthcare enterprises access to computer servers and programs residing in each Data Center.

7.     HCAIT does not own any hospitals.

## JURISDICTION AND VENUE

8.     This is a civil action arising under the laws of the United States. This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a), (b) in that this action states federal claims for copyright infringement and contributory copyright infringement under the Copyright Act, 17 U.S.C. § 101 *et seq.*, and diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) in that the amount in controversy exceeds $75,000,

exclusive of interest and costs, and this matter is between citizens of different states.

Additionally, this Court has supplemental jurisdiction over the subject matter of BlueChip's

unfair and deceptive trade practices claim under 28 U.S.C. § 1367.

9.      This Court has personal jurisdiction over HCAIT because HCAIT has extensive

business contacts with this judicial district, including the business which forms the basis for this

civil action.

10.     Venue is proper in this district under 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

### A.    The MedArchive Software

11.     BlueChip is a leading developer of software solutions for the healthcare

marketplace. BlueChip's software products scan, automate, and archive numerous forms of

healthcare facility and patient data. In January 2001, BlueChip purchased the rights to the

MedArchive Software package (the "MedArchive Software" or the "Software") from EMC

Corporation ("EMC") which had only recently before purchased principally all of the assets of

Data General, Inc. ("Data General").

12.     EMC's agreement with BlueChip gives BlueChip "an exclusive, perpetual,

worldwide, fully paid up, royalty free, non-revocable license to use, copy, modify, reproduce,

distribute, and sublicense" the MedArchive Software.

13.     EMC's agreement with BlueChip gives BlueChip "the sole right to sue for past,

present and future infringements" of the copyright in the MedArchive Software.

14.     The original version of the MedArchive Software was designed by Data General

to operate on a UNIX platform. Since acquiring the MedArchive Software from EMC, BlueChip

has developed and now also offers a Windows version of the MedArchive Software, which is a

newer and more advanced version of the MedArchive software than the UNIX version. With one exception, all of HCAIT's Data Centers use the UNIX version of the MedArchive Software.

15.    BlueChip is the owner of copyright registration No. TXu-1-210-154 in the MedArchive Software.

16.    The MediTech Hospital Information System (the "MediTech System") is a set of software applications used by hospitals and medical facilities such as HCA to manage data such as accounting, billing, and patient medical records.

17.    As designed, the MedArchive Software is a software program that enables healthcare facility users of the MediTech System, to archive and store (i.e. "offload") data that is not considered to be current for purposes of the MediTech System . The MedArchive Software enables this data to be archived to and stored on a server authorized to run the MedArchive Software (a "MedArchive Server").

18.    The MedArchive Software operates in the following manner: The MedArchive Software code operates on independent MedArchive Servers. Data that is managed currently in a MediTech System environment is, when the data is no longer considered current, sent from a MediTech System to a MedArchive Server. The MedArchive Software operates to cause the MedArchive Server to accept the data, compress the data, and write the data to a storage medium. The MedArchive Software then operates to cause the MedArchive Server to acknowledge to the MediTech System receipt of the data to be archived from the MediTech System and its storage on a MedArchive Server.

19.    A healthcare facility operating a MediTech System may retrieve data from a MedArchive Server by sending a request to the MedArchive Server through the MediTech System. The MedArchive Software operates to cause the MedArchive Server to accept the request, retrieve the archived data, and send the archived data to the MediTech System.

20.    During operation of the MedArchive Server, particularly during data storage and data retrieval, portions of the MedArchive Software are copied, executed, and deleted.

## B.    HCAIT and the MedArchive Software

21.    Prior to May 1999, HCAIT entered into an agreement with Data General, Inc. to use the MedArchive Software.

22.    The agreement between HCAIT and Data General allowed HCAIT to operate the MedArchive Software on a server license basis, with the license fee based upon the number of MedArchive Servers.  HCAIT had represented to BlueChip that it had acquired and therefore held a valid license, acquired originally from Data General, for the MedArchive Software with respect to 76 MedArchive Servers.  BlueChip has not been able to verify this representation independently.

23.    Under the agreement between HCAIT and Data General, HCAIT was obligated to pay Data General hardware maintenance fees.

24.    Under the agreement between HCAIT and Data General, HCAIT was obligated to pay Data General software maintenance fees.

25.    With one exception noted below, HCAIT operates and has operated the UNIX version of MedArchive on its MedArchive Servers.  HCAIT's Orlando, Florida Data Center has, since May 2003, operated a Windows version of the MedArchive Software in a MedArchive Server located at that Data Center.

26.    HCAIT provides an "outsourced" information technology management solution both to HCA-owned facilities and to non-HCA-owned facilities.  A number of the non-HCA-owned facilities that HCAIT provides outsourced information technology services to were once owned by HCA, but are no longer owned by HCA and have not been owned by HCA since 1999.

27.    HCAIT's MedArchive Servers archive and store data for hundreds of hospitals and other healthcare facilities, some owned and operated by HCA, and others owned and operated by independent third parties. HCAIT makes the MedArchive Software available to these healthcare facilities so that they may archive data and retrieve such data when requested.

### C.    HCA Hospital Divestiture

28.    Prior to and during 1999, HCA (formerly known as Columbia-HCA) was the target of an investigation by the United States Department of Justice into fraud and unlawful billing practices. The investigation culminated in 1999 with a consent decree.

29.    HCA agreed to plead guilty to criminal conduct and agreed to pay more than $840 million in criminal fines, civil penalties and damages.

30.    HCA also agreed to divest a number of its hospitals and other healthcare facilities into separately owned and operated corporations.

31.    In May 1999 HCA completed the "spin-offs" of LifePoint Hospitals, Inc. ("LifePoint") Triad Hospitals, Inc. ("Triad") through the distribution of shares of LifePoint common stock and Triad common stock to HCA shareholders.

32.    In 1999 HCA also completed "spin-offs" of a number of other hospital and healthcare facility groups and/or clusters (collectively, the "Divested Facilities").

33.    A condition for qualifying as a tax-free spin-off under the rules of the Internal Revenue Service is that following the divestiture the "spun off" entity or entities be separate corporate entities with separate ownership, management, and control from the original parent company.

34.    LifePoint is an independently-owned, managed, controlled and publicly traded company.

35.     LifePoint is not a subsidiary, parent, or sister company of HCAIT. LifePoint is not a subsidiary of HCA.

36.     Triad is an independently-owned, managed, controlled and publicly traded company.

37.     Triad is not a subsidiary, parent, or sister company of HCAIT. Triad is not a subsidiary of HCA.

38.     LifePoint and Triad account for approximately one-half of the number of the Divested Facilities. The other one-half of the Divested Facilities are unrelated to HCA, HCAIT, Life Point or Triad. More than one-half of the Divested Facilities are users of the outsourced information technology services, including the MedArchive Software, offered and provided by HCAIT.

### D.    **HCAIT and BlueChip**

39.     After BlueChip purchased the MedArchive Software from EMC in January 2001, BlueChip and Data General separately sent letters to HCAIT notifying it and HCA of the purchase.

40.     At the time that BlueChip purchased the MedArchive Software from EMC in January 2001, HCAIT disclosed to BlueChip that it operated the MedArchive Software on 76 MedArchive Servers. BlueChip did not independently verify this data.

41.     At the time of the MedArchive Software acquisition, BlueChip also discovered that HCAIT was paying software maintenance fees for only one MedArchive Server, despite operating the MedArchive Software on at least 76 MedArchive Servers.

42.     BlueChip demanded that HCAIT pay software maintenance fees for 76 MedArchive Servers.

43.     Subsequently, HCAIT agreed to pay, and began paying, software maintenance fees for 76 MedArchive Servers.

E.      **The Software License Agreement and Master Software Support Agreement**

44.     After BlueChip purchased the MedArchive Software, it began negotiating with its customers for new license agreements to replace existing agreements customers may have had with Data General.

45.     In late 2001, BlueChip and HCAIT negotiated a Software License Agreement ("the License Agreement") for HCAIT to license the MedArchive Software from BlueChip, and a Master Software Support Agreement ("the Support Agreement") for BlueChip to provide support for the MedArchive Software to HCAIT.

46.     The License Agreement is attached hereto as Exhibit 1. The Support Agreement is attached hereto as Exhibit 2. In these agreements HCAIT is referred to as either LICENSEE or CUSTOMER.

47.     Paragraph 1.f. of the License Agreement states that:

"LICENSEE" includes but is not limited to LICENSEE, its parent, all subsidiaries and subsidiaries of subsidiaries of the parent, and sister companies, and shall not include any vendors of LICENSEE.

48.     The License Agreement and Support Agreement were each signed by Noel Williams, President of HCAIT, on December 6, 2001 and by Carol A. Rynkowski, Treasurer of BlueChip, on January 3, 2002 on behalf of their respective companies.

49.     HCAIT has no rights to the MedArchive Software not enumerated in the License Agreement or the Support Agreement.

50.     The License Agreement allows HCAIT to operate the MedArchive Software on 76 servers listed in Exhibit A to the License Agreement.

58.    In late 2002, BlueChip became aware that HCAIT had without notice or permission used BlueChip's Database Repair Utility to transfer data from one MedArchive Server to another.

59.    HCAIT was not licensed to use BlueChip's Database Repair Utility to transfer data from one MedArchive Server to another.

60.    Prior to BlueChip's confronting HCAIT about its use of the Database Repair Utility HCAIT had never disclosed to BlueChip its use of the Database Repair Utility to transfer data from one MedArchive Server to another server.

61.    BlueChip demanded that HCAIT disclose to BlueChip its use of the Database Repair Utility.

62.    HCAIT admitted to using the Database Repair Utility to transfer data from a MedArchive Server on at least six occasions.

63.    BlueChip demanded HCAIT pay for six licenses to cover HCAIT's use of the Database Repair Utility as an alternative to the Migration Utility.

64.    HCAIT subsequently paid for six licenses to cover HCAIT's use of the Database Repair Utility.

65.    BlueChip did not independently verify the number of data transfers from a MedArchive Server to another server.

66.    HCAIT did not notify BlueChip of any additional data transfers from one MedArchive Server to another after that time.

G.    **The 2004 Negotiations**

67.    In early 2004, BlueChip sent a letter to its customers notifying them that BlueChip would be terminating its support for the UNIX version of the MedArchive Software effective June 1, 2004. The letter offered customers a free license upgrade to the newest

51.     Paragraph 2.a. of the License Agreement provides that HCAIT has the right to use the MedArchive Software "provided that the number of…Servers does not exceed the permitted number of same for which LICENSEE has paid the applicable Licensed Software license fees…"

52.     Paragraph 2.b. of the License Agreement states that "Licensed Software and Third Party Software is licensed for Use only by the original LICENSEE…"

53.     Paragraph 2.f. of the License Agreement states that:

The parties agree[] not to disclose, lease, sublicense, assign or otherwise make available, in whole or in part, any Licensed Software, Confidential Information or any portion thereof, in any form, to any person, third party, corporation, or entity other than to LICENSEE's employees, contractors, and consultants…

54.     Paragraph 3 of the License Agreement states that:

LICENSEE may Use the Licensed Software on other computers, devices, Server(s) or Networks owned or operated by LICENSEE, provided that LICENSEE amend Exhibit A, Designated Equipment by providing [BlueChip], within fifteen (15) days prior written notice of such change by certified mail, registered return receipt…and prior payment at the additional fees…

55.     Paragraph 12.c. of the License Agreement states that:

Jurisdiction and venue of any kind and all claims and lawsuits of or relating to this Agreement in any way shall reside in the Commonwealth of Massachusetts.

### F.     HCAIT's Improper Use of BlueChip's Database Repair Utility

56.     During 2002, HCAIT agreed with BlueChip to acquire a limited use license of BlueChip's "Database Utility" for the purpose of repairing corrupted records in HCAIT's Oracle MedArchive database.

57.     At that time, HCAIT also indicated its interest in transferring data from one MedArchive Server to another MedArchive Server, and BlueChip quoted to HCAIT a price for a separate transaction to license a single use MedArchive Migration Utility to be used for this purpose.  HCAIT did not take further steps to license the Migration Utility.

Windows version of MedArchive. The letter also noted that BlueChip professional services would be required to migrate from the old UNIX-based MedArchive Software to the new Windows-based MedArchive Software. HCAIT received a version of this letter.

68.    After receiving the such letter, HCAIT approached BlueChip to discuss an extended maintenance contract for the UNIX version of the MedArchive Software.

69.    BlueChip and HCAIT then entered into discussions regarding BlueChip's possible extension of BlueChip's maintenance of HCAIT's UNIX based MedArchive Software or HCAIT's possible conversion to the Windows based MedArchive Software.

70.    On May 5, 2004, representatives from BlueChip met with representatives from HCAIT at HCAIT's offices in Nashville, Tennessee.

71.    During this meeting a representative from HCAIT indicated for the first time that HCAIT was running the MedArchive Software on approximately 87 servers.

72.    At the International meeting of the Medical Users Software Exchange (MUSE) in Florida between May 10 and May 18, 2004 a representative from HCAIT informed a representative of BlueChip that HCAIT was running the MedArchive Software on approximately 94 servers.

73.    As a result of this information BlueChip engaged in discussions with HCAIT to determine the exact number of servers running the MedArchive Software.

74.    On July 28, 2004, representatives from BlueChip again met with representatives from HCAIT at HCAIT's offices in Nashville, Tennessee.

75.    At this meeting, representatives from HCAIT indicated that they would investigate and determine how many servers belonging to HCAIT or HCA were operating the MedArchive Software.

76.    HCAIT did not contact BlueChip in response to its commitment to BlueChip representatives that it would investigate and determine the number of servers using the MedArchive Software until mid-October 2004.

77.    HCAIT's response to BlueChip was that HCAIT was "within its contractual rights" concerning the use of MedArchive Software, but did not indicate the number of HCAIT servers using the MedArchive Software, or the total number of facilities being served.

78.    During the period between May 2004 and October 2004, BlueChip and HCAIT continued to discuss the possibility of BlueChip migrating data stored on HCAIT's UNIX based MedArchive Servers to new servers running the Windows based MedArchive Software.

79.    As part of these discussions, BlueChip inquired as to the total number of hospitals or facilities using HCAIT's MedArchive Servers to archive data.

80.    On repeated occasions since May 5, 2004, HCAIT refused to provide BlueChip with the total number of hospitals or facilities using HCAIT's MedArchive Servers to archive data.

81.    In October 2004, BlueChip received a correspondence from HCAIT indicating that 236 facilities used HCAIT's MedArchive Servers.

82.    Later in October 2004, BlueChip received a correspondence from HCAIT indicating that 294 facilities used HCAIT's MedArchive Servers. This correspondence contained a list of each facility name and a breakdown of which facilities were using which HCAIT MedArchive Server.

83.    This correspondence listed several facilities which were owned by Triad, several facilities which were owned by LifePoint, and several facilities which were not owned by Triad, LifePoint, or HCA.

84.    In late 2004, BlueChip discovered another document indicating that HCAIT had 103 MedArchive Servers.

## H.    HCAIT's Use of MedArchive

85.    HCAIT currently has at least 75 servers running the UNIX version of MedArchive Software, and at least one server running the Windows version. HCAIT acquired the single license to use the Windows version of MedArchive Software in approximately May 2003. HCAIT has regularly ignored Blue Chip's advice and instructions regarding the proper deployment and use of the Windows version of the MedArchive Software. Such disregard has greatly increased the cost to Blue Chip of providing maintenance and support to HCAIT for the Windows version of the MedArchive Software.

86.    At one or more times HCAIT has operated the MedArchive Software on more than 76 servers simultaneously.

87.    HCAIT is currently operating the MedArchive Software on more than 76 servers simultaneously.

88.    HCAIT has transferred the MedArchive Software onto servers onto which HCAIT is not authorized to make such transfers under the terms of the License Agreement.

89.    HCAIT is currently operating the MedArchive Software on servers on which HCAIT is not authorized to operate the Software under the terms of the License Agreement.

90.    HCAIT did not provide notice to BlueChip pursuant to Paragraph 3 of the License Agreement that HCAIT was using the MedArchive Software on servers not authorized to store and operate the MedArchive Software under the terms of the License Agreement.

91.    HCAIT did not provide prior payment to BlueChip when HCAIT installed the MedArchive Software on servers not authorized to store and operate the MedArchive Software under the terms of the License Agreement.

92.    HCAIT is currently allowing non-HCA facilities to store data on HCAIT's MedArchive Servers and otherwise making available Licensed Software to non-licensed parties.

93.    HCAIT has been allowing non-HCA facilities to store data on HCAIT's MedArchive Servers and otherwise making available licensed MedArchive Software to unrelated, non-licensed parties.

94.    In early 2005 BlueChip made a formal request to HCAIT to perform an audit of HCAIT's Data Centers pursuant to Paragraph 2.j. of the License Agreement.

95.    HCAIT refused to provide BlueChip with a list of the healthcare facilities serviced by HCAIT and refused to allow BlueChip to make copies of HCAIT's electronic records to confirm that HCAIT was in compliance with the License Agreement.

96.    Because of HCAIT's restrictions BlueChip did not conduct the audit.

## COUNT I
## COPYRIGHT INFRINGEMENT
### (17 U.S.C. § 501)

97.    BlueChip repeats and realleges the allegations contained in the paragraphs above as if fully set forth herein.

98.    HCAIT has made unauthorized copies of the MedArchive Software in violation of 17 U.S.C. § 501, including without limitation by copying the MedArchive Software to unauthorized servers.

99.    HCAIT has made unauthorized copies of some or all of the MedArchive Software in violation of 17 U.S.C. § 501, including without limitation by operating the MedArchive Software on unauthorized servers.

100.    HCAIT's copyright infringement has been knowing and willful.

101.    BlueChip is entitled to recover from HCAIT actual damages suffered by

BlueChip as a result of HCAIT's infringement as well as HCAIT's profits resulting from its

unauthorized copying of the MedArchive Software.

## COUNT II
## CONTRIBUTORY COPYRIGHT INFRINGEMENT
(17 U.S.C. § 501)

102.    BlueChip repeats and realleges the allegations contained in the paragraphs above

as if fully set forth herein.

103.    HCAIT has made the MedArchive Software available to unauthorized parties.

104.    When these unauthorized parties access and use the MedArchive Servers, such

access creates unauthorized copies of portions of the MedArchive Software.

105.    HCAIT's providing access to its MedArchive servers to unauthorized parties

induces those unauthorized parties to create unauthorized copies of portions of the MedArchive

Software.

106.    HCAIT's activity constitutes contributory copyright infringement in violation of

17 U.S.C. § 501.

107.    HCAIT's contributory copyright infringement has been knowing and willful.

108.    BlueChip is entitled to recover from HCAIT actual damages suffered by

BlueChip as a result of HCAIT's contributory infringement as well as HCAIT's profits resulting

from its contributory infringement.

## COUNT III
## BREACH OF CONTRACT

109.    BlueChip repeats and realleges the allegations contained in the paragraphs above

as if fully set forth herein.

110.    HCAIT has breached Paragraph 2.f. of the License Agreement by making the MedArchive Software available to unauthorized parties.

111.    HCAIT has breached Paragraph 2.a. of the License Agreement by operating the MedArchive Software on servers other than the 76 MedArchive Servers authorized by the License Agreement.

112.    HCAIT has breached Paragraph 3 of the License Agreement by failing to notify BlueChip, and failing to make payment for, HCAIT's installing the MedArchive Software on servers not identified in the License Agreement.

113.    HCAIT's conduct has further breached other portions of the License Agreement.

114.    BlueChip has been, and will continue to be, damaged by HCAIT's breaches of the License Agreement. BlueChip is entitled to recover these damages from HCAIT.

## COUNT IV
## UNFAIR AND DECEPTIVE TRADE PRACTICES
## UNDER MASS. GEN. L. CH. 93A

115.    BlueChip repeats and realleges the allegations contained in the paragraphs above as if fully set forth herein.

116.    HCAIT is, and has at all relevant times been, engaged in commerce.

117.    While HCAIT's acts and/or omissions described herein occurred in a variety of locations both nationwide and worldwide, their impact was felt on BlueChip, a Massachusetts-based company, such that their center of gravity is primarily and substantially in the Commonwealth.

118.    Defendant's acts and/or omissions as described hereinabove, constituted unfair and deceptive acts and practices in violation of Mass. Gen. L. ch. 93A.

119.    Defendant's acts and/or omissions were, as described hereinabove, were willful and knowing.

120.    BlueChip has been damaged by HCAIT's conduct and is entitled to injunctive relief, as well as treble damages and attorneys' fees.

## RELIEF REQUESTED

WHEREFORE, BlueChip requests that this Court:

A.    Permanently enjoin HCAIT, including its partners, officers, agents, servants, employees, parent, subsidiaries, sister companies, and all those persons and entities in active concert or participation with them, from further infringement, direct or contributory, of the copyrights in and to the MedArchive Software, pursuant to 17 U.S.C. § 502, from further breaching the License Agreement, and from further unfair and deceptive trade practices pursuant to Mass. Gen. L. ch. 93A.

B.    Direct HCAIT to pay to BlueChip its actual damages and any additional profits realized by HCAIT, pursuant to 17 U.S.C. § 504.

C.    Direct HCAIT to pay to BlueChip its damages sustained as a result of HCAIT's breaches of the License Agreement.

D.    Enter judgment that HCAIT's copyright infringements, breaches of the License Agreement, and unfair and deceptive trade practices have been knowing and willful.

E.    Award BlueChip its attorney fees and costs in prosecuting this action, pursuant to 17 U.S.C. § 505, Paragraph 12.e. of the License Agreement, Mass. Gen. L. ch. 93A, or otherwise.

F.    Award BlueChip treble damages pursuant to Mass. Gen. L. ch. 93A or otherwise.

G.    Award BlueChip such further relief as this Court may deem just and proper.

## JURY DEMAND

BlueChip demands a trial by jury of all issues so triable.

BLUECHIP TECHNOLOGIES LTD.

By its attorneys,

Dated: April 19, 2005

Michael A. Albert, BBO # 558566
malbert@wolfgreenfield.com
Ilan N. Barzilay, BBO # 643978
ibarzilay@wolfgreenfield.com
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, Massachusetts 02210
617.646.8000 phone
617.720.2441 fax

*Attorneys for Plaintiff BlueChip Technologies Ltd.*



**Software License Agreement**

Form # BCT500
Rev. 02/2001

This AGREEMENT (the "Agreement") is a legally binding agreement between BlueChip Technologies Ltd. ("BCT") and you, HCA INFORMATION TECHNOLOGY & SERVICES, INC. 2555 Park Plaza, Nashville, TN., ("LICENSEE"). The LICENSEE is subject to the terms and condition of this Software License Agreement. This is a license agreement and is not an agreement for the sale of software. BCT continues to own the software and all of the rights contained therein. By using the Licensed Software the LICENSEE agrees to be bound by the terms of this Agreement.

NOW, THEREFORE, in consideration of the conditions and covenants set forth hereinafter, it is agreed as follows:

**1. DEFINITIONS:**

a. "Concurrent Users" is the number of simultaneous uses, local or remote (including in a Network), of Licensed Software or any portion thereof.

b. "Confidential Information" means any information of any party whether or not developed by the other, including but not limited to preexisting or new information which relates to all ideas, designs, methods, discoveries, improvements, products, Licensed Software, or trade secrets, product data and specifications, proprietary rights, business affairs, product developments, customer information or employee information. Confidential Information specifically includes patient identification and/or the content of medical records. However, Confidential Information shall not include any of these items that (i) were known to that party prior to disclosure, (ii) are in the public domain, (iii) become in the public domain through no fault of the receiving party, or (iv) have been received from a third party not bound by a confidentiality agreement to the disclosing party.

c. "Designated Equipment" consists of Servers, computers and devices, identified by a vendor's serial number and as otherwise specified in Exhibit A Designated Equipment.

d. "Distributed Software" means any software product, or any software incorporated into or supplied with a product, which is packaged with a notice to the effect that opening the package, or installing or using the product, or taking any other action, signifies an agreement with the software owner (BCT or a third party) to be bound by specified license terms and conditions.

e. "Licensed Software" is the computer programming code (object code only) including documentation and software updates, modifications, and patches, furnished by BCT to LICENSEE for Use specified in Exhibit B Licensed Software, but excluding Distributed Software.

f. "LICENSEE" includes but is not limited to LICENSEE, its parent, all subsidiaries and subsidiaries of subsidiaries of the parent, and sister companies, and shall not include any vendors of LICENSEE.

g. "Network" is the configuration of Designated Equipment, Server(s) and other devices, authorized by BCT for use herein, specified in Exhibit A that allow for the flow of data and use of resources between one another.

h. "Server" is a computer or device, specified in Exhibit A, which provides information or services (including but not limited to file storage and retrieval, printing, and management of network resources) to computers connected to the Network.

i. "Third Party Software" is Licensed Software or a portion thereof, which is owned, in whole or in part, by an independent third party and licensed to BCT.

j. "Use" means (i) to reproduce copies of any portion of software onto Designated Equipment within a Network, (ii) to distribute copies of the software on a Network between units in a Network, and (iii) to display and perform the software on Designated Equipment.

k. "User(s)" means LICENSEE's employees, contractors, and consultants, provided that such contractors and consultants are not in the business of selling software for integrated document management, who Use the Licensed Software, Distributed Software or Third Party Software.

**2. LICENSED SOFTWARE TERMS & PROTECTION OF LICENSED SOFTWARE:**

a. BCT or its affiliated companies or its suppliers own copyrights in the Licensed Software and all copies of the Licensed Software. BCT grants LICENSEE's Users and Concurrent Users a personal, non-transferable and non-exclusive right to Use the Licensed Software and Third Party Software on the Designated Equipment and Network, provided that the number of Users, Concurrent Users, and Servers does not exceed the permitted number of same for which LICENSEE has paid the applicable Licensed Software license fees pursuant to Section 4 of this Agreement.

b. Licensed Software and Third Party Software is licensed for Use only by the original LICENSEE provided LICENSEE reproduces on the copies all copyright notices, trademark designations and other proprietary information legends.

c. Licensed Software may be transferred to a back-up computer temporarily if the Designated Equipment or Network is inoperative due to malfunction, casualty, or for testing back-up procedures.

d. Except as expressly authorized in this Agreement, LICENSEE agrees not to: (i) reproduce copies, distribute copies, display, perform, adapt, or modify the Licensed Software, in whole or in part, electronically or otherwise; (ii) reverse assemble, reverse engineer, reverse compile, or otherwise translate or disassemble the Licensed Software or

(iii) sub-license, lease, assign, or otherwise transfer, in whole or in part, LICENSEE's license for the Licensed Software.

e.  LICENSEE agrees to take appropriate action by instruction, agreement, or otherwise to safeguard and satisfy its obligations under this Agreement with respect to the reproduction, distribution, display, performance, disclosure, protection and securing of the Licensed Software, which obligation shall survive any termination of this Agreement.

f.  The parties agrees not to disclose, lease, sub-license, assign or otherwise make available, in whole or in part, any Licensed Software, Confidential Information or any portion thereof, in any form, to any person, third party, corporation, or entity other than to LICENSEE's employees, contractors, and consultants provided that such employees, contractors and consultants are not in the business of selling software for integrated document management and BCT's employees.

g.  BCT may terminate this Agreement for any failure by LICENSEE to comply with the terms and conditions of this Agreement and such failure is not cured within thirty (30) days of receipt of written notice of such failure. Upon notice of termination, LICENSEE shall return or destroy the Licensed Software and all portions and copies thereof.

h.  Distributed Software is licensed only under the terms and conditions of the packaged license agreement(s) included therewith and not under this Agreement.

i.  The original and all copies of the Licensed Software, in whole or in part, shall be the property of BCT or, in the case of Third Party Software, shall be the property of BCT and/or its third party licensors.

j.  Audit. During the term of this Agreement and for a term of one (1) year after termination, upon ten (10) days written notice, BCT or an agent of BCT by following all local security and confidentiality measures, may enter the premises of any location where the Licensed Software is being or was Used and perform reasonable audit and inspection procedures and make copies of documents and electronic records to confirm that LICENSEE is in compliance with the terms and conditions of this Agreement, including but not limited to, provisions relating to the License, Use of the Licensed Software, protection of Confidential Information, and termination. LICENSEE shall cooperate in any such inquiry.

## 3. CHANGE OR ADDITION OF DESIGNATED EQUIPMENT:

LICENSEE may Use the Licensed Software on other computers, devices, Server(s) or Networks owned or operated by LICENSEE, provided that

LICENSEE amend Exhibit A, Designated Equipment by providing BCT, within fifteen (15) days prior written notice of such change by certified mail, registered return receipt, including the serial number(s), model number(s) and manufacturer(s) of the computer(s), device(s) or Server(s); and the effective date of the change and prior payment at the additional fees as provided for in Section 4 of this Agreement.

## 4. CHARGES/ PAYMENTS:

a.  Licensed Software fees shall be at BCT's prices in effect at the time BCT accepts an order for Licensed Software or new Licensed Software as specified in Exhibit B or as specified by an authorized BCT quotation in force at the time BCT accepts an order for Licensed Software pursuant to such quote.

b.  LICENSEE shall pay all taxes paid or payable by BCT (exclusive of taxes based on BCT's net income) for products or services supplied.

c.  The license to Use the Licensed Software, is conditioned upon BCT having first been paid, or open account credit having been established for all applicable license fees.

d.  Prior to Use of the Licensed Software on additional or changed Designated Equipment pursuant to Section 3 of this Agreement, and provided that LICENSEE may replace equipment with the same or similar specifications so long as LICENSEE does not aggregate the equipment LICENSEE shall pay BCT additional license fees based on BCT's then current license fees for such additional or changed Designated Equipment and LICENSEE shall not be entitled to any refunds or credits. If LICENSEE aggregates the equiptment upon which the Licensed Software operates, LICENSEE shall immediately notify BCT in writing and LICENSEE shall pay BCT additional license fees based on BCT's then current license fees for such aggregate Designated Equipment.

## 5. SOFTWARE SUPPORT:

BCT offers support for some, but not all, Licensed Software. Support may only be provided under Form # BCT601, Master Software Support Agreement.

## 6. U.S. GOVERNMENT DATA RIGHTS:

Licensed Software, Distributed Software, and related documentation are "commercial computer software" or commercial computer software documentation." If LICENSEE is a unit of the U.S. government, then the rights of the U.S. Government with respect to such software and documentation are limited by the terms of this Agreement pursuant to FAR 12.212(a) and/or DFARS 227.7202-1(a) as applicable.

## 7. TERM AND TERMINATION:

a.  Each license granted hereunder shall remain in force and effect until LICENSEE discontinues Use of the Licensed Software to which the license applies or until the license is otherwise terminated, whichever occurs earlier.

b.  Within thirty (30) days after LICENSEE has discontinued the Use of the Licensed Software or within ten (10) days after BCT has terminated any license, LICENSEE shall certify in writing, by certified registered return receipt mail, to BCT that through its best efforts and to the best of its knowledge, the original and all copies, in whole or in part, of the discontinued or terminated Licensed Software have been destroyed.

c.  Upon prior written authorization from BCT, LICENSEE may retain a copy of such discontinued or terminated Licensed Software for archival purposes only.

d.  LICENSEE agrees that BCT shall have the right to terminate this Agreement and the licenses granted hereunder if LICENSEE Uses the Licensed Software or any portion thereof in any manner inconsistent with the terms of this Agreement.

## 8. PATENT AND COPYRIGHT INDEMNIFICATION:

a.  BCT at its own expense shall defend, indemnify, and hold harmless LICENSEE with respect to any action brought against LICENSEE to the extent that it is based upon a claim that any Use of Licensed Software within the scope of the license granted hereunder infringes a United States patent or copyright, provided LICENSEE notifies BCT promptly in writing, by certified mail, of the action (and all prior claims relating to such action) and BCT has sole control of the defense and all negotiations for its settlement or compromise.

b.  In the event the Licensed Software or any portion thereof becomes, or in BCT's opinion is likely to become, the subject of a claim of infringement of a patent or copyright, BCT may at its option either secure for LICENSEE the right to continue Using the Licensed Software, replace or modify it to make it non-infringing or, if neither of the foregoing alternatives is reasonably available to BCT, discontinue LICENSEE's right to Use the Licensed Software upon one month's written notice.

c.  BCT shall have no liability for any claim of copyright or patent infringement based upon (i) LICENSEE'S Use of other than the current and the previous unaltered release of the Licensed Software available from BCT if such infringement would have been avoided by the Use of such unaltered release, or (ii) LICENSEE'S Use in combination of the Licensed Software with software or data not supplied by BCT.

d.  THE FOREGOING INDEMNITY DOES NOT APPLY TO THIRD PARTY SOFTWARE OR DIAGNOSTIC SOFTWARE, AND BCT SHALL HAVE NO LIABILITY TO LICENSEE FOR ANY INFRINGEMENT BY THIRD PARTY SOFTWARE, THIRD PARTY CONSULTANTS, OR DIAGNOSTIC SOFTWARE. THE FOREGOING STATES THE ENTIRE LIABILITY OF BCT WITH RESPECT TO ANY INFRINGEMENT BY LICENSED PROGRAMS OR ANY PORTION THEREOF.

## 9. WARRANTY:

a.  For a period of ninety (90) days from delivery, the Licensed Software shall conform to BCT's then current specifications or documentation, whichever is applicable.

b.  LICENSEE acknowledges that the Licensed Software may have inherent defects and agrees that, as BCT's sole liability and as LICENSEE's sole remedy, BCT shall provide services as described in the then current Form # BCT601 during the ninety (90) day period to correct documented failures in which BCT's diagnosis indicates are caused by a defect in an unaltered version of the then latest release of the Licensed Software.

c.  BCT DOES NOT WARRANT THE RESULT OF ANY SUCH SERVICES OR WARRANT THAT ANY OR ALL FAILURES OR ERRORS SHALL BE CORRECTED OR WARRANT THAT THE FUNCTIONS CONTAINED IN THE LICENSED PROGRAM SHALL MEET LICENSEE'S REQUIREMENTS OR SHALL OPERATE IN THE COMBINATIONS SELECTED BY LICENSEE.

d.  This limited warranty extends only to the LICENSEE and may not be transferred or assigned, in whole or in part.

e.  BCT warrants the media of the Licensed Software provided by BCT to the LICENSEE against physical defects for a period of ninety (90) days from the date of delivery to LICENSEE. BCT, at its sole option, shall either replace defective media, at no cost to the LICENSEE, or refund the purchase price thereof, provided it is returned postage prepaid to BCT within the ninety (90) day period. This shall be LICENSEE's exclusive remedy and BCT's sole obligation and liability for defective media. The foregoing media warranty covers normal use and does not apply if the media has been damaged by accident, abuse, misuse or misapplication, and/or has been modified without BCT's written permission.

f.  Except for the media warranty in Section 9.e, LICENSED PROGRAMS CLASSIFIED AS "NOT SUPPORTED" ARE LICENSED ON AN "AS IS" BASIS WITHOUT ANY WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING

ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

g. Intellectual Property Warranty. BCT warrants that the Licensed Software and LICENSEE'S Use thereof in accordance with the Documentation, shall not infringe or violate the patent, trademark, copyright, trade secret, or any other intellectual property right of any entity not a party to this Agreement.

h. Virus Protection. BCT warrants and represents that at the time the Licensed Software as delivered to LICENSEE, the Licensed Software is free of any "worm," "trojan horse," "virus", or other malicious code or device (as such terms are understood in the computer industry) which could improperly impair the LICENSEE'S Use of the Licensed Software. The Licensed Software may contain "metering" and/or "lockout" measures (as such terms are understood in the computer industry).

## 10. DISCLAIMER OF WARRANTY:

a. EXCEPT FOR THE ABOVE EXPRESS WARRANTIES, THERE ARE NO WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR WARRANTY OF INTEGRATION OR INTEROPERABILITY; TO THE MAXIMUM EXTENT ALLOWABLE BY LAW, THE UNIFORM COMPUTER INFORMATION TRANSACTIONS ACT SHALL NOT APPLY TO THIS AGREEMENT.

b. THE STATED EXPRESS WARRANTIES ARE IN LIEU OF ALL LIABILITIES OR OBLIGATIONS OF BCT AND ITS THIRD PARTY SUPPLIERS FOR DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE DELIVERY OR USE OF THE LICENSED PROGRAMS. LICENSEE ASSUMES THE FULL RESPONSIBILITY FOR THE SELECTION AND USE OF THE LICENSED PROGRAMS.

## 11. LIMITATION OF LIABILITY:

a. LICENSEE AGREES THAT BCT'S AND ITS THIRD PARTY SUPPLIERS' LIABILITY, IF ANY, FOR DAMAGES, INCLUDING BUT NOT LIMITED TO LIABILITY ARISING OUT OF CONTRACT, NEGLIGENCE, STRICT LIABILITY IN TORT, WARRANTY, OR PATENT OR COPYRIGHT INFRINGEMENT, SHALL NOT EXCEED THE LICENSE FEES PAID BY LICENSEE FOR THE LICENSED PROGRAM INVOLVED. THIS LIMITATION OF LIABILITY SHALL NOT APPLY TO CLAIMS FOR PERSONAL INJURY CAUSED SOLELY BY BCT'S OR ITS THIRD PARTY SUPPLIERS' NEGLIGENCE.  THIS LIMITATION SHALL NOT APPLY TO INTELLECTUAL PROPERTY

INDEMINIFICATION, WILLFUL MISCONDUCT AND GROSS NEGLIGENCE AS IT RELATES TO TITLE 7 OF THE UNITED STATES CODE.

b. LICENSEE FURTHER AGREES THAT BCT AND ITS THIRD PARTY SUPPLIERS SHALL NOT BE LIABLE FOR ANY LOST PROFITS OR FOR ANY CLAIM OR DEMAND AGAINST THE LICENSEE BY ANY OTHER PARTY.

c. IN NO EVENT SHALL BCT OR ITS THIRD PARTY SUPPLIERS BE LIABLE FOR ANY DAMAGES, OTHER THAN THE LICENSE FEES REFERENCED ABOVE, WHETHER INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL, EVEN IF BCT AND/OR ITS THIRD PARTY SUPPLIERS HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

d. NO ACTION AGAINST EITHER PARTY OR THEIR THIRD PARTY SUPPLIERS, REGARDLESS OF FORM, ARISING OUT OF OR INCIDENTAL TO THE TRANSACTIONS UNDER THIS AGREEMENT, SHALL BE BROUGHT BY THE OTHER PARTY MORE THAN ONE YEAR AFTER THE CAUSE OF ACTION HAS ACCRUED.

## 12. GENERAL:

a. Resale, export, or re-export of products, Licensed Software and Distributed Software are subject to U.S. export laws, including but not limited to the Export Administration Regulations (E.A.R.) of the U.S. Department of Commerce Office of Export Licensing. LICENSEE agrees to comply with U.S. Government export law, regulations, and procedures, and any other applicable export restrictions. Without prejudice to the generality of the foregoing, LICENSEE shall not export, release or re-export directly or indirectly to countries subject to U.S. software and technology export control restrictions (currently those in Country Groups D: 1 or E: 2), or to countries under any other U.S. export restrictions, or to nationals of those same countries: the technology, software, or object code for the software LICENSEE may receive that is on the Commerce Control List; or the direct product of such technology or software if the direct products are commodities, software or technology on the Commerce Control List, without the prior written authorization of the U.S. Department of Commerce, unless otherwise permitted under the U.S. Export Administration Regulations. These obligations shall survive the expiration or termination of this Agreement.

b. The laws of the Commonwealth of Massachusetts, excluding its conflict of law rules shall govern this Agreement.

c. Jurisdiction and venue of any kind and all claims

and lawsuits of or relating to this Agreement in any way shall reside in the Commonwealth of Massachusetts.

d. LICENSEE shall neither assign any right nor delegate any obligation under this Agreement and any attempted assignment or delegation shall be void.

e. LICENSEE shall pay all costs and expenses, including reasonable attorney's fees, incurred by BCT in exercising any rights available to BCT to the extent BCT is successful in enforcing such rights.

f. The procurement of equipment of the type and capacity required for Use of Licensed Software on LICENSEE's equipment, as those Licensed Software are initially delivered or as they may be subsequently enhanced or revised by either BCT or LICENSEE, shall be LICENSEE'S responsibility and shall be at LICENSEE's expense.

g. A copyright notice on Licensed Software by itself does not constitute a publication or public disclosure.

h. The parties agree that LICENSEE will not intentionally provide protected health information as that term is defined in 42 CFR 164 ("Protected Health Information") to BCT so that BCT can carry out, assist with the performance or perform on behalf of LICENSEE a function or activity for LICENSEE. However, in the event that BCT's employees, agents or subcontractors come in contact with Protected Health Information, BCT shall use commercially reasonable efforts to maintain the security of the Protected Health Information and to prevent unauthorized use and/or disclosure of the Protected Health Information. BCT will promptly report any unauthorized uses or disclosures to LICENSEE of which BCT becomes aware.

i. With regard to the use and/or disclosure of Protected Health Information, BCT may make available documentation relating to the use and/or disclosure of Protected Health Information to the Secretary of Health and Human Services for purposes of determing compliance with the Health Insurance Portability and Accountability Act of 1996, subject to attorney-client and other applicable legal privileges.

j. The section headings used herein are for reference and convenience only and shall not enter into the interpretation hereof.

k. If any of the provisions of this Agreement are invalid under any applicable statute or rule of law, they are to that extent deemed omitted.

l. This Agreement is the complete and exclusive statement of the Agreement between the parties as to the Licensed Software and supersedes all prior oral and written communications, proposals, agreements, representations, statements, negotiations and undertakings.

m. BCT shall have no obligation whatsoever under an order for Licensed Software until a written acceptance thereof is dispatched to LICENSEE by a duly authorized representative of BCT.

n. LICENSEE expressly agrees that he has read and understands the foregoing and that the Licensed Software shall be Used by LICENSEE solely in accordance with the terms and conditions of this Agreement.

o. NO MODIFICATION, RENEWAL OR WAIVER OF, NOR ADDITION TO, THE TERMS AND CONDITIONS OF THIS AGREEMENT SHALL BE BINDING UPON BCT, AND BCT HEREBY REJECTS ALL SUCH MODIFICATIONS, RENEWALS, WAIVERS AND ADDITIONS, UNLESS SPECIFICALLY SET FORTH IN A WRITING SIGNED BY AN AUTHORIZED REPRESENTATIVE OF BCT AT MARBLEHEAD, MASSACHUSETTS.

**BLUECHIP TECHNOLOGIES LTD.**

BY: _Carol A_____

PRINT NAME: _Carol A Rynkowski_

TITLE: _Treasurer_

DATE SIGNED: _01-03-02_

**LICENSEE**

BY: _Noel Williams_

PRINT NAME: _Noel Williams_

TITLE: _President_

DATE SIGNED: _12/06/01_

## Exhibit A - List of Designated Equipment

**HCA MEDARCHIVE SYSTEMS BY REGIONAL DATA CENTERS AND CPCS NETWORKS**

| Cur-rent RDC | Cur-rent NW | Market Network | MedArchive Host Name | DNS Name | Status | IMC Server | MedTape | Time Zone | Type | Serial Number |
|---|---|---|---|---|---|---|---|---|---|---|
| AK | AKA | Alaska | akaarch | akaarch.colhca.com | Live | | | Alaska | MSO | 110802-5508 |
| CO | NHA | New Hampshire | nhaarch | nhaarch.colhca.com | Live | | | Eastern | MSO | |
| CO | OHA | Ohio | ohaarch | ohaarch.colhca.com | Live | | | Eastern | MSO | 103782-5239 |
| CO | VAA | Richmond | vaaarch | vaaarch.colhca.com | Live | | | Eastern | MSO | 103782-7927 |
| CO | VAB | Virginia | vabarch | vabarch.colhca.com | Live | | | Eastern | MSO | 103782-7985 |
| CO | VAC | Northern Virginia | vacarch | vacarch.colhca.com | Live | | | Eastern | MSO | 103782-6873 |
| CO | VAD | Richmond | vadarch | vadarch.colhca.com | Live | | | Eastern | MSO | 110802-5524 |
| CO | WVA | West Virginia | wvaarch | wvaarch.colhca.com | Live | Yes | | Eastern | MSO | 103782-7924 |
| CO | WVB | Massachusetts | wvbarch | wvbarch.colhca.com | Live | | | Eastern | MSO | 110802-5502 |
| CO | WVC | West Virginia | wvcarch | wvcarch.colhca.com | Live | | | Eastern | MSO | |
| FW | ARA | Arkansas | araarch | araarch.colhca.com | Live | | | Central | MSO | 110802-5525 |
| FW | ARB | El Dorado | arbarch | arbarch.colhca.com | Live | | | Central | MSO | 110802-5504 |
| FW | AZB | Phoenix | azbarch | azbarch.colhca.com | Live | | | Mountain (AZ) | MSO | 107247-0539 |
| FW | KSA | Kansas City / Missouri | ksaarch | ksaarch.colhca.com | Live | | | Central | MSO | 103782-5278 |
| FW | KSB | Wichita | ksbarch | ksbarch.colhca.com | Live | | | Central | MSO | 103782-7979 |
| FW | LAA | Central Louisiana | laaarch | laaarch.colhca.com | Live | Yes | | Central | MSO | 103782-5235 |
| FW | LAB | New Orleans | labarch | labarch.colhca.com | Live | | Yes | Central | MSO | 103782-9912 |
| FW | LAC | Lafayette | lacarch | lacarch.colhca.com | Live | | | Central | MSO | 110802-5518 |
| FW | LAH | Lake Charles | laharch | laharch.colhca.com | Live | | | Central | MSO | 110802-5500 |
| FW | TXB | El Paso (Optical de-installed) | txbarch | txbarch.colhca.com | Live | | | Mountain | MSO | 103782-7920 |
| FW | TXD | Corpus Christi | txdarch | txdarch.colhca.com | Live | | | Central | MSO | 103782-6874 |
| FW | TXG | Dallas / Ft. Worth | txgarch | txgarch.colhca.com | Live | | | Central | MSO | 103782-7607 |
| FW | TXH | Texas | txharch | txharch.colhca.com | Live | | Yes | Central | MSO | 110802-5517 |
| LO | ILA | Chicago / Illinois | ilaarch | ilaarch.colhca.com | Live | | | Central | MSO | 110802-5538 |
| LO | INA | Indiana | inaarch | inaarch.colhca.com | Live | | | Eastern (IN) | MSO | 110802-5534 |
| LO | KYC | Kentucky | kycarch | kycarch.colhca.com | Live | | | Eastern | MSO | 103782-5280 |
| LO | NCA | North Carolina | ncaarch | ncaarch.colhca.com | Live | | | Eastern | MSO | 110802-5499 |
| LO | NCB | North Carolina | ncbarch | ncbarch.colhca.com | Live | | | Eastern | MSO | |
| LO | OKA | Oklahoma | okaarch | okaarch.colhca.com | Live | Yes | | Central | MSO | 103782-5630 |
| LO | OKB | Tulsa | okbarch | okbarch.colhca.com | Live | | | Central | MSO | 110802-5506 |
| LO | SCA | South Carolina | scaarch | scaarch.colhca.com | Live | | | Eastern | MSO | 110802-5519 |
| NA | ALA | North Alabama | alaarch | alaarch.colhca.com | Live | Yes | Yes | Eastern | MSO | 103782-4403 |
| NA | ALB | South Alabama | albarch | albarch.colhca.com | Live | | | Central | MSO | |
| NA | ALC | Huntsville | alcarch | alcarch.colhca.com | Live | | | Central | MSO | |
| NA | CLT | Certification Lab | cltarch | cltarch.colhca.com | Live | | | Central | MSO | |
| NA | GAA | Georgia | gaaarch | gaaarch.colhca.com | Live | Yes(AK) | | Central | MSO | 103782-5237 |
| NA | KYA | Quality Assurance | kyaarch | kyaarch.colhca.com | Live | | Yes* | Central | MSO | 103782-7973 |
| NA | MSA | Mississippi | msaarch | msaarch.colhca.com | Live | | | Central | MSO | |
| NA | TNA | Middle Tennessee | tnaarch | tnaarch.colhca.com | Live | | Yes* | Central | MSO | 103782-7674 |
| NA | TNB | Chattanooga | tnbarch | tnbarch.colhca.com | Live | | Yes | Eastern | MSO | |
| NA | TND | East Tennessee | tndarch | tndarch.colhca.com | Live | | Yes | Eastern | MSO | |
| NA | TNE | Lawrenceburg | tnearch | tnearch.colhca.com | Live | | Yes | Central | MSO | |
| NA | TNF | Pulaski | tnfarch | tnfarch.colhca.com | Live | | Yes | Central | MSO | |
| NA | TNJ | Winchester | tnjarch | tnjarch.colhca.com | Live | | | Central | MSO | |

Confidential

| NA | TSI | Distributed Systems Test Network | tsiarch | tsiarch.colhca.com | Live | | Yes | Central | MSO | |
|----|-----|------|----|-----|----|----|----|----|----|----|
| | | Distributed Systems Test Network | tsiarch | tsiarch.colhca.com | Live | | Yes | Central | MSO | 103782-6878 |
| OR | FLA | Miami | flaarch | flaarch.colhca.com | Live | | | Eastern | MSO | 103782-5272 |
| OR | FLB | Miami | flbarch | flbarch.colhca.com | Live | | | Eastern | MSO | 103782-7105 |
| OR | FLC | Fort Myers | flcarch | flcarch.colhca.com | Live | | | Eastern | MSO | 103782-5255 |
| OR | FLD | Miami | fldarch | fldarch.colhca.com | Live | | | Eastern | MSO | 103782-5284 |
| OR | FLE | Aventura | flearch | flearch.colhca.com | Live | | | Eastern | MSO | 103782-5221 |
| OR | FLF | Orlando | flfarch | flfarch.colhca.com | Live | | | Eastern | MSO | 103782-5249 |
| OR | FLG | Tampa | flgarch | flgarch.colhca.com | Live | | Yes | Eastern | MSO | 103782-7583 |
| OR | FLH | Jacksonville | flharch | flharch.colhca.com | Live | | | Eastern | MSO | 103782-6880 |
| OR | FLI | Florida Panhandle | fliarch | fliarch.colhca.com | Live | | | Central | MSO | 103782-6884 |
| OR | FLJ | Palm Beach County | fljarch | fljarch.colhca.com | Live | | | Eastern | MSO | 103782-7976 |
| OR | FLK | Treasure Coast | flkarch | flkarch.colhca.com | Live | | | Eastern | MSO | 103782-7980 |
| OR | FLL | North Central Florida | fllarch | fllarch.colhca.com | Live | | | Eastern | MSO | 110802-5541 |
| PH | AZA | Arizona | azaarch | azaarch.colhca.com | Live | | | Mountain (AZ) | MSO | 103782-5251 |
| PH | CAA | San Francisco / Bay Area | caaarch | caaarch.colhca.com | Live | | | Pacific | MSO | 103782-6877 |
| PH | CAC | Los Angeles | cacarch | cacarch.colhca.com | Live | | | Pacific | MSO | 110802-5535 |
| PH | CAD | San Diego | cadarch | cadarch.colhca.com | Live | | | Pacific | MSO | 103782-6872 |
| PH | COA | Denver | coaarch | coaarch.colhca.com | Live | | | Mountain | MSO | 110802-5539 |
| PH | IDA | Idaho | idaarch | idaarch.colhca.com | Live | | | Central | MSO | 110802-5540 |
| PH | NMA | New Mexico | nmaarch | nmaarch.colhca.com | Live | | | Mountain | MSO | 103782-5245 |
| PH | NVA | Nevada | nvaarch | nvaarch.colhca.com | Live | | Yes | Pacific | MSO | 110802-5520 |
| PH | ORA | Oregon | oraarch | oraarch.colhca.com | Live | | | Pacific | MSO | 110802-5510 |
| PH | ORB | Oregon | orbarch | orbarch.colhca.com | Live | | | Pacific | MSO | 103782-6803 |
| PH | UTA | Utah | utaarch | utaarch.colhca.com | Live | | | Mountain | MSO | 110802-5514 |
| PH | WAA | Washington | waaarch | waaarch.colhca.com | Live | | Yes | Mountain | MSO | 110802-5523 |
| SA | LAD | Northern Louisiana | ladarch | ladarch.colhca.com | Live | | | Central | MSO | 110802-5512 |
| SA | LAG | Springhill | lagarch | lagarch.colhca.com | Live | | | Central | MSO | 103782-5241 |
| SA | TXA | Houston | txaarch | txaarch.colhca.com | Live | | | Central | MSO | 103782-1041 |
| SA | TXE | Beaumont | txearch | txearch.colhca.com | Live | | Yes | Central | MSO | 103782-5223 |
| SA | TXF | San Antonio | txfarch | txfarch.colhca.com | Live | | | Central | MSO | 103782-7922 |
| SA | TXI | Austin | txiarch | txiarch.colhca.com | Live | | | Central | MSO | 103782-6881 |
| SA | TXJ | Wharton | txjarch | txjarch.colhca.com | Live | | | Central | MSO | |

Confidential

Exhibit B - List of Designated Software

| BlueChip Model # | DESCRIPTION | Other Model# | 5X9 SVC Model # | 7X24 SVC Model # | OpSys |
|---|---|---|---|---|---|
| RTSVRB | Runtime Server Base | A864AZA1AN | RTSVRB59 | RTSVRB724 | NT |
| RTPL | Runtime Port License | A867AZA1AN | RTPL59 | RTPL724 | NT |
| RTIDI | IDImage Server Base | A865AZA1AN | RTIDI59 | RTIDI724 | NT |
| WFGSVR | Workflow (Imageflow) gateway server base | A884AZA1AN | WFGSVR59 | WFGSVR724 | NT |
| IDIC | IDImage Client | A869AZA1AN | IDIC59 | IDIC724 | NT |
| RTBFX2 | Runtime Fax output | A889AZA1AN | RTBFX259 | RTBFX2724 | NT |
| WFRSET | Workflow Rule | A892AZA1AN | WFRSET59 | WFRSET724 | NT |
| | | | | | |
| BCEID | BlueChip Enterprise ID Database | | BCEID59 | BCEID724 | |
| | | | | | |
| | | | | | |
| MANT | MedArchive NT Server | | MANT59 | MANT724 | NT |
| MAUXI | MedArchive DGUX Intel | | MAUXI59 | MAUXI724 | UX |
| MAUXM | MedArchive DGUX Motorola | | MAUXM59 | MAUXM724 | UX |
| | | | | | |
| MSNT | MedScan NT Server | | MSNT59 | MSNT724 | NT |
| MSUXI | MedScan DGUX Intel | | MSUXI59 | MSUXI724 | UX |
| MSUXM | MedScan DGUX Motorola | | MSUXM59 | MSUXM724 | UX |
| | | | | | |
| MSDOS | MedScan Distributed Object Server | | MSDOS59 | MSDOS724 | NT |
| MSSS | MedScan Scan Station | | MSSS59 | MSSS724 | NT |
| MSVS | MedScan Verify Station | | MSVS59 | MSVS724 | NT |
| MSWP | MedScan Workflow Processor | | MSWP59 | MSWP724 | NT |
| MSIV | MedScan Image Viewer | | MSIV59 | MSIV724 | NT |
| MSCDE | MedScan Clinical Department Edition | | MSCDE59 | MSCDE724 | NT |
| MSOA | MedScan Object Archive | | MSOA59 | MSOA724 | NT |
| MSOAEE | MedScan Object Archive Enterprise Edition | | MSOAEE59 | MSOAEE724 | NT |
| | | | | | |
| MSSDB | MedScan Server Database | | MSSDB59 | MSSDB724 | |
| MSFAC | MedScan Folder Archive COLD | | MSFAC59 | MSFAC724 | |
| MSAE | MedScan Administrative Edition LK | | MSAE59 | MSAE724 | |
| | | | | | |
| MSCM | MedScan Chart Manager | | MSCM59 | MSCM724 | NT |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

BLUECHIP TECHNOLOGIES LTD. 100 PLEASANT STREET, MARBLEHEAD, MA 01945

## EXHIBIT C

### SUPPORTED PROGRAMS

**CONTRACT NUMBER:** _____    **CONTRACT START DATE:** 1-Jul-01

**INVOICE TO: (CUSTOMER/LICENSEE)**

| | |
|---|---|
| Company | HCA INFORMATION SERVICES, INC |
| Street | 2555 PARK PLAZA |
| City | NASHVILLE |
| State | TN.    Zip    37202 |
| Contact | TONY HINTON |
| Tel. | (615) 344-8244 |

**INSTALLATION LOCATION:**

| | |
|---|---|
| Company | HCA INFORMATION SERVICES, INC |
| Street | 2555 PARK PLAZA |
| City | NASHVILLE |
| State | TN.    Zip    37202 |
| Contact | |
| Tel. | |

| LINE | BCT MODEL # | OLD MODEL # | QTY | DESCRIPTION | UNIT CHARGE | EXTENDED CHARGE |
|---|---|---|---|---|---|---|
| 1 | MAUX724 | A445AZN61A | 76 | MEDARCHIVE UX EXTENDED SUPPORT (DG MEDARCHIVE SUPPORT PLUS) | $ 330.00 | $ 25,080.00 |
| 2 | | | | | | $ - |
| 3 | MSUX724 | A446AZN61A | 1 | MEDSCAN UX EXTENDED SUPPORT (DG/MEDSCAN SUPPORT PLUS) | $1,500.00 | $ 1,500.00 |
| 4 | | | | | | $ - |
| 5 | ADDCALL | WOO1AZNSSN | 10 | ADDITIONAL CALLERS (ADDITIONAL CALLERS) | $ 125.00 | $ 1,250.00 |
| 6 | | | | | | $ - |
| 7 | PROACT | PASS+ | 1 | PROACTIVE SOFTWARE SUPPORT | $ 500.00 | $ 500.00 |
| 8 | | | | | | $ - |
| 9 | | | | | | $ - |
| 10 | | | | | | $ - |
| 11 | | | | | | $ - |
| 12 | | | | | | $ - |
| 13 | | | | | | $ - |
| 14 | | | | | | $ - |
| 15 | | | | | | $ - |

**TOTAL MONTHLY CHARGE**    $ 28,330.00

Services beyond the scope of the MASTER SOFTWARE SUPPORT AGREEMENT will be billed in accordance with each Incident "Incident Fee." An Incident fee will be billed at the rate of $500 for each Incident and an additional $250 for each hour in excess of two (2) hours associated with each Incident. The stated prices are firm for thirty days from the date of this quote unless modified in writing by BlueChip Technologies ltd. (BCT) before your order is accepted. Your order is accepted only if a written acknowledgement is dispatched from BCT's corporate offices by its authorized representative. Accepted orders for equipment shall be governed by the purchase agreement then in effect between you and BlueChip. If any, otherwise by the terms and conditions of additional quote(s.). Accepted orders for software (except distributed software) shall be governed by the Software License Agreement (SLA.). Accepted orders for maintenance and support services shall be governed by the terms and conditions in the appropriate service agreement which must accompany the order.

| LICENSEE AUTHORIZED SIGNATURE: | | DATE: | BCT APPROVED BY: |
|---|---|---|---|

BLUECHIP TECHNOLOGIES PROPRIETARY AND CONFIDENTIAL    HCA EXHIBIT C  SUPPORTED PROGRAMS 3-2-01 .XLS    3/2201



**Master Software Support Agreement**

Form #BCT601
Rev. 02/2001

This AGREEMENT (the "Agreement") is a legally binding agreement between BlueChip Technologies Ltd. ("BCT") and  HCA - INFORMATION TECHNOLOGY & SERVICES, INC ("CUSTOMER/LICENSEE").
The software support services for which CUSTOMER subscribes shall be provided by BCT in accordance with this Agreement through the BCT Customer Support Center ("CSC").
A SEPARATE SCHEDULE IS REQUIRED FOR EACH SYSTEM RUNNING BCT SUPPORTED PROGRAMS.
NOW, THEREFORE, in consideration of the conditions and covenants set forth hereinafter, it is agreed as follows:

BCT Agreement No. **BCTHCA010**                          CUSTOMER No. **HCAISI**
Sales Order No. _____          CUSTOMER P.O. No. _____

<table>
<tr><td>

**INVOICE TO: (CUSTOMER/LICENSEE)**
Company:  HCA - INFORMATION TECHNOLOGY & SERVICES, INC.
Street **2555 PARK PLAZA**
City **NASHVILLE** State **TN**   ZIP **37202**
Contact **TONY HINTON**
Tel. **(615) 344-8244**
Designated Caller: _____
Telephone: _____
Term Selected:    Single year.    Multi-year.  __ years

</td><td>

**INSTALLATION LOCATION**
Company: **HCA - INFORMATION TECHNOLOGY & SERVICES**, INC.
Street **2555 PARK PLAZA**
City **NASHVILLE**                State **TN**   ZIP **37202**
Contact TONY HINTON
Tel. (       )
First Alternate: _____
Second Alternate: _____
Start Date: **July 1, 2001**

</td></tr>
</table>

## A. DEFINITIONS

1.  "Support" shall mean either Standard Support or Extended Support as described herein.  2.  "Supported Programs" shall mean certain BCT Licensed Programs and certain Third Party Programs licensed or sub-licensed by BCT, pursuant to the Software License Agreement (Form # BCT 500), specified in Exhibit C.

## B. SCOPE OF SERVICES

1.  This Agreement is executed with and subject to the terms and conditions of the Software License Agreement (Form #BCT500), which are incorporated herein by reference and executed by and between CUSTOMER/LICENSEE and BCT.  In the event there is a conflict between the terms of this Agreement and any Exhibit or Schedule attached hereto and the Software License Agreement, the terms and conditions of the Software License Agreement shall control.

2.  As used herein, the capitalized terms shall have the meanings ascribed to them pursuant to the Software License Agreement Form #BCT 500.

3.  Support offered by BCT for Supported Program(s) may include or consist of Standard Support and/or Extended Support described in Section C of this Agreement.

## C. STANDARD & EXTENDED SUPPORT

1.  Under Standard Support and/or Extended Support updates and revisions for Supported Programs are provided during the Term of this Agreement (Section F).
2.  Standard Support is available from 8:00 a.m. to 5:00 p.m. Monday through Friday, Eastern Standard Time.
3.  Extended Support is available seven (7) days a week, twenty-four (24) hours a day.  Additional designated CSC callers may be added to an Extended Support subscription for a fixed monthly fee per caller.
4.  Each Support subscription for a Supported Program conveys the right to Use the updated Licensed Software pursuant to the terms and conditions contained in Form # BCT500 or a BCT-approved sublicense.
5.  Information regarding Licensed Software enhancements, programming notes, documentation, and corrections to BCT Licensed Software may also be provided from time to time via e-mail or via BCT's website.
6.  The Software License Agreement (Form #BCT 500) conveys to CUSTOMER the right to Use the Supported Software on other Designated Equipment pursuant to Section 3 Change or Addition of Designated Equipment, without requiring BCT to supply duplicate media and documentation.
7.  BCT shall accept Software Trouble Reports (STRs) for the current revision of Supported Programs.  STRs for the last previous revision shall also be accepted as late as one hundred eighty (180) days after the shipment date of the current revision.
8.  For all STRs accepted, BCT may:
    a.  acknowledge each STR by mail and assign an

STR control number to each,

    b.  provide status information on each STR on the BCT website; and

    c.  provide either an interim fix under Telephone Software Support, a permanent fix in the BCT Licensed Program or documentation through Standard Support, or provide one of the following responses as appropriate: "problem not reproducible," "user error" or "to be considered in future revisions."

9. Telephone Software Support (TSS). Toll-free telephone assistance is available to CUSTOMER's Designated Caller or either of two (2) designated alternates for the applicable periods for Standard Support or Extended Support, respectively.

10. TSS includes:

    a.  software problem diagnosis consisting of problem isolation and definition;

    b.  preparation of software problem report(s); and

    c.  assistance with the proper operation of the Supported Programs.

11. BCT shall attempt to provide an emergency bypass or temporary work-around.

12. Remote Software Support (RSS). RSS utilizes communications devices in conjunction with TSS for remote problem diagnosis and assistance with the operation of Supported Programs.

13. As additional support options become available for Supported Products licensed to CUSTOMER, CUSTOMER may subscribe to them for a period equal to the remainder of the Term of this Agreement, at the prices then in effect when the subscription was entered.

## D. EXCLUSIONS

Support provided under this Agreement shall not include: operating systems, supplies or accessories; service due to failure of software not supplied by BCT; services provided when the reported problem is caused by hardware, firmware or media, by operator error, by CUSTOMER's negligence or improper Use of the Designated Equipment, or by CUSTOMER's failure to perform its responsibilities under Section G of this Agreement.

## E. ELIGIBILITY

1. Support provided under this Agreement is limited to (i) Supported Programs in which the CUSTOMER represents and warrants are newly licensed at Installation Locations within the continental United States and/or (ii) CUSTOMERS who are running then current releases of Supported Software in live production for three (3) months prior to the date of this Agreement, at Installation Locations within the continental United States.

2. Each Supported Program for which support is requested shall be licensed under BCT's Form # BCT500 or a valid BCT sub-license agreement on each central processing unit (CPU) on which CUSTOMER Uses the Supported Program.

3. In its discretion, BCT may make a pre-contract on-site inspection and audit of up to four (4) hours, at no charge.

4. Any Designated Equipment repairs, adjustments or

installation of revisions and updates to Supported Programs deemed necessary by BCT shall be made before Standard Support or Extended Support is provided.

## F. TERM OF AGREEMENT

1. The Term of this Agreement shall be as noted above, but not less than one (1) year. After the Term, this Agreement shall continue in force until terminated by either party upon six (6) months written notice.

2. BCT may discontinue Support of any or all individually Supported Program upon six (6) months written notice to the CUSTOMER.

## G. RESPONSIBILITIES OF CUSTOMER

1. CUSTOMER agrees that the Use of any and all updates, changes, improvements, revisions, patches, data or documentation furnished by BCT in connection with Supported Programs shall be governed by the terms and conditions of the relevant Software License Agreement, Form # BCT500 or sub-license agreement, and this Agreement.

2. CUSTOMER shall provide secure storage space, spare tapes, disk packs, paper and other miscellaneous supplies, designated work area(s), and access to a local telephone, at no charge to BCT.

3. CUSTOMER shall provide a representative who shall be available on site while the BCT representative is present.

4. CUSTOMER shall maintain the Designated Equipment on which the Supported Programs are running at the prescribed BCT revision levels, and shall maintain a current back-up copy of the Supported Programs as well as any other programs and data used on the Designated Equipment.

5. All updates and/or revisions furnished to CUSTOMER hereunder shall be installed on the Designated Equipment within one hundred eighty (180) days from the date they are shipped by BCT to CUSTOMER.

6. CUSTOMER shall provide BCT with the name and telephone number of CUSTOMER's Designated Caller along with the names of two (2) designated alternates, and any additional callers designated under Section C of this Agreement. CUSTOMER shall update this information when appropriate.

## H. CHARGES

1. Prices for Standard Support and Extended Support subscribed for as of the Start Date shall not be increased during the first twelve (12) months of the Term. Thereafter, the prices in BCT's then current Price List shall apply, subject to the conditions in Section H and Exhibit C of this Agreement.

2. BCT shall notify CUSTOMER at least sixty (60) days in advance of any price increase taking effect after the twelfth month of the Term.

3. Invoices are due thirty (30) days after invoice date. Interest shall accrue on past due amounts at 1.5% per month or the highest lawful rate, whichever is less.

4. Taxes. CUSTOMER shall be responsible for any

federal, state or municipal taxes levied on or in respect of services furnished under this Agreement, including sales, use and excise taxes and duties, except taxes based on BCT's income.

5. Exclusions. Labor and material charges for services resulting from: (i) CUSTOMER's order for services not covered under this Agreement or any related service agreement, such as charges associated with Section I Movement of Equipment or (ii) CUSTOMER's failure to comply with Section G Responsibilities of Customer shall be invoiced to CUSTOMER at BCT's rates and terms in effect when such services are performed.

## I. MOVEMENT OF EQUIPMENT

1. CUSTOMER shall give BCT at least thirty (30) days prior written notice of its intent to move any Designated Equipment from one Installation Location to another. The dismantling of Designated Equipment and its reinstallation at a new Installation Location shall be solely CUSTOMER's responsibility.

2. The Designated Equipment shall be subject to inspection and repair charges by BCT pursuant to Section H of this Agreement.

3. BCT shall have no further obligation under this Agreement with respect to any Designated Equipment moved to a location outside the United States.

## J. DISCLAIMER OF WARRANTY

1. BCT DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED WITH REGARD TO THE SERVICES PROVIDED HEREUNDER, INCLUDING ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARISING OUT OF THE PERFORMANCE OF THIS AGREEMENT.

2. TO THE MAXIMUM EXTENT ALLOWABLE BY LAW, THE UNIFORM COMPUTER INFORMATION TRANSACTION ACT SHALL NOT APPLY TO THIS AGREEMENT.

## K. LIMITATION OF LIABILITY

1. LICENSEE AGREES THAT BCT'S AND ITS THIRD PARTY SUPPLIERS' LIABILITY, IF ANY, FOR DAMAGES, INCLUDING BUT NOT LIMITED TO LIABILITY ARISING OUT OF CONTRACT, NEGLIGENCE, STRICT LIABILITY IN TORT, WARRANTY, OR PATENT OR COPYRIGHT INFRINGEMENT, SHALL NOT EXCEED THE LICENSE FEES PAID BY LICENSEE FOR THE LICENSED PROGRAM INVOLVED. THIS LIMITATION OF LIABILITY SHALL NOT APPLY TO CLAIMS FOR PERSONAL INJURY CAUSED SOLELY BY BCT'S OR ITS THIRD PARTY SUPPLIERS' NEGLIGENCE. THIS LIMITATION SHALL NOT APPLY TO THE INTELLECTUAL PROPERTY INDEMINIFICATION PROVISIONS, WILLFUL MISCONDUCT AND GROSS NEGLIGENCE AS IT RELATES TO TITLE 7 OF THE UNITED STATES CODE.

b. LICENSEE FURTHER AGREES THAT BCT AND ITS THIRD PARTY SUPPLIERS SHALL NOT BE LIABLE FOR ANY LOST PROFITS OR FOR ANY CLAIM OR DEMAND AGAINST THE LICENSEE BY ANY OTHER PARTY.

c. IN NO EVENT SHALL BCT OR ITS THIRD PARTY SUPPLIERS BE LIABLE FOR ANY DAMAGES, OTHER THAN THE LICENSE FEES REFERENCED ABOVE, WHETHER INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL, EVEN IF BCT AND/OR ITS THIRD PARTY SUPPLIERS HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

d. NO ACTION AGAINST EITHER PARTY OR THEIR THIRD PARTY SUPPLIERS, REGARDLESS OF FORM, ARISING OUT OF OR INCIDENTAL TO THE TRANSACTIONS UNDER THIS AGREEMENT, SHALL BE BROUGHT BY THE OTHER PARTY MORE THAN ONE YEAR AFTER THE CAUSE OF ACTION HAS ACCRUED.

2. Should BCT install any updates and/or revisions to the Supported Programs, it shall do so only on the condition that BCT and its suppliers and subcontractors shall have no liability whatsoever for any effect such update and/or revision may have on CUSTOMER's Use of the Designated Equipment and/or the Supported Programs.

3. In no event shall BCT's total liability for damages under this agreement exceed the total net charges paid by CUSTOMER to BCT for services during the twelve (12) month period immediately preceding a claim under this Agreement.

## L. TERMINATION

1. Notwithstanding Section F Term of Agreement, BCT shall have the right to terminate this Agreement upon the occurrence of any of the following events:

   a. CUSTOMER fails to perform or observe any material obligations to BCT under this Agreement including, but not limited to: any breach of the terms of this Agreement; and/or any breach of the terms of the Software License Agreement (Form # BCT500); any breach of the CUSTOMER'S representations and/or warranties; any breach of the timely payment of any sums due to BCT; and/or any breach of Section G Responsibilities of CUSTOMER.

   b. CUSTOMER admits in writing its inability to pay its debts generally as they become due, or executes an assignment or similar document for the benefit of creditors;

   c. the appointment of a receiver, trustee in bankruptcy or similar officer regarding CUSTOMER's property; and/or

   d. There is a transfer of a majority interest of the equity or assets of CUSTOMER by a competetor of BCT or an assignment of this Agreement without the written consent of BCT within ninety (90) days and such event is not remedied to the reasonable satisfaction of BCT within ninety (90)days after BCT has sent

written notice to CUSTOMER.

2. Termination shall not be BCT's exclusive remedy and no
   such termination shall adversely affect any claim, right
   or action which BCT may have for damages or otherwise
   against CUSTOMER regarding any failure of
   CUSTOMER to perform or observe its obligations to
   BCT.

**M. GENERAL**

1. Any notice required or allowed under this Agreement
   shall be deemed properly given if mailed postage prepaid
   to CUSTOMER at the invoice address shown above or to
   BCT at 1000 Pleasant Street, Marblehead, Massachusetts
   01945, Attention: Contracts Administration.
2. Any claim, action, or lawsuit by CUSTOMER under this
   Agreement must be commenced within one (1) year after
   the cause of action accrues.
3.
4. Headings not controlling.  The headings in this Agreement
   are for convenience only and do not in any way limit or
   amplify the terms or conditions of this Agreement.

**BLUECHIP TECHNOLOGIES LTD.**

BY: _Carol A Rynbowski_

PRINT NAME: _Carol A Rynbowski_

TITLE: _Treasurer_

DATE SIGNED: _01-03-02_

**HCA INFORMATION TECHNOLOGY & SERVICES,
INC.**

BY: _Noel Williams_

PRINT NAME: _Noel Williams_

TITLE: _President_

DATE SIGNED: _12/06/01_

Wbw

**EXHIBIT C** TO MASTER AGREEMENT NOTED BELOW,
BETWEEN BLUE CHIP TECHNOLOGIES AND HCA-INFORMATION TECHNOLOGY
**SOFTWARE SUPPORT PRICE SCHEDULE** SERVICES, INC.

| CONTRACT NUMBER: S110 | | CONTRACT SCHEDULE START : April 1, 2004 | |
|---|---|---|---|
| **INVOICE TO: (CUSTOMER/LICENSEE)** | | **INSTALLATION LOCATION:** | |
| COMPANY: | HCA-INFORMATION TECHNOLOGY SERVICES, INC. | COMPANY: | |
| STREET: | 2555 PARK PLAZA | STREET: | |
| CITY: | NASHVILLE | CITY: | |
| STATE: | TN | ZIP: 37203 | STATE: | ZIP: |
| CONTACT: | TONY HINTON, JOHN GRASMICK | CONTACT: | |
| TEL: | | TEL: | |

| LINE | BCT MODEL# | QTY | CURRENT BEDSIZE | DESCRIPTION | UNIT CHARGE | EXTENDED CHARGE |
|---|---|---|---|---|---|---|
| 1 | MA724 | | | MEDARCHIVE EXTENDED STANDARD 7X24 | $28,828.43 | $345,941.16 |
| 2 | MS724 | | | MEDSCAN EXTENDED STANDARD 7X24 | $1,724.21 | $20,690.52 |
| 3 | ADDCALL | | | ADDITIONAL CALLERS | $1,436.85 | $17,242.20 |
| 4 | PROACT | | | PROACTIVE SOFTWARE SUPPORT | $574.74 | $6,896.88 |

TOTAL MONTHLY CHARGE: $32,564.23

THE PARTIES Whw

Note: By signing this Exhibit C, ~~Customer agrees~~ and commits to an extended contract
term beginning April 1, 2004 and ending December 31, 2006.  The pricing listed above
is effective July 1, 2004 through June 30, 2005 and is subject to a limited annual price
increase on the anniversary date, in accordance with the Master Software Support
Agreement (#BCT 601 dated 12/06/01.)

Services beyond the scope of the SOFTWARE SUPPORT AGREEMENT will be billed in accordance with each incident "Incident Fee". An
incident fee will be billed at the rate of $700 for each incident and an additional $350 for each hour in excess of two (2) hours associated
with each incident. The stated prices are firm for thirty days from the date of this quote ~~then are subject to change by BlueChip~~ Wbw
~~Technologies, Ltd. (BCT) before your order is accepted.~~ Accepted orders for equipment shall be governed by the purchase agreement then in
effect between you and BlueChip, if any, otherwise by the terms and conditions of additional quote(s).  Accepted orders for software
(except distributed software) shall be governed by the Software License Agreement (SLA).  Accepted orders for maintenance and support
services shall be governed by the terms and conditions in the appropriate service agreement ~~which must accompany the order.~~ Wbw

| LICENSEE AUTHORIZED SIGNATURE: | BCT APPROVED BY: |
|---|---|
| Neal Williams | |

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET 05 - 10784 JLT

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS

BlueChip Technologies, LTD.

**DEFENDANTS**

HCA Information Technology & Services, Inc.

**(b)**  County of Residence of First Listed Plaintiff      Essex
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant      Nashville, TN
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)**  Attorney's (Firm Name, Address, and Telephone Number)

Michael A. Albert, Ilan M. Barzilay 617-646-8000
Wolf Greenfield & Sacks P.C., 600 Atlantic Avenue, Boston, MA 02210

Attorneys (If Known)

## II. BASIS OF JURISDICTION     (Place an "X" in One Box Only)

☐ 1   U.S. Government
        Plaintiff

☐ 3   Federal Question
        (U.S. Government Not a Party)

☐ 2   U.S. Government
        Defendant

☒ 4   Diversity
        (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                              and One Box for Defendant)

|                                      | PTF | DEF |                                                              | PTF | DEF |
|--------------------------------------|-----|-----|--------------------------------------------------------------|-----|-----|
| Citizen of This State                | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State    | ☒ 4 | ☐ 4 |
| Citizen of Another State             | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State| ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation                                           | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT     (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☒ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN     (Place an "X" in One Box Only)

☒ 1   Original
        Proceeding

☐ 2   Removed from
        State Court

☐ 3   Remanded from
        Appellate Court

☐ 4   Reinstated or
        Reopened

☐ 5   Transferred from
        another district
        (specify)

☐ 6   Multidistrict
        Litigation

☐ 7   Appeal to District
        Judge from
        Magistrate
        Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 1331, 28 U.S.C. 1338(a), 17 U.S.C. 101

Brief description of cause:
Breach of Contract: Copyright Infringement

## VII. REQUESTED IN
COMPLAINT:

☐  CHECK IF THIS IS A CLASS ACTION
       UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:      ☒ Yes    ☐ No

## VIII. RELATED CASE(S)
IF ANY

(See instructions):      JUDGE

DOCKET NUMBER

DATE
April 19, 2005

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #              AMOUNT              APPLYING IFP              JUDGE              MAG. JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY) _BlueCip Technologies, LTD_
   v. _HCA Information Technology & Services, Inc._

2. CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL COVER SHEET. (SEE LOCAL RULE 40.1(A)(1)).

   ☐ I.   160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

   ☒ II.  195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,        *Also complete AO 120 or AO 121
          740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.           for patent, trademark or copyright cases

   ☐ III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
          315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
          380, 385, 450, 891.

   ☐ IV.  220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
          690, 810, 861-865, 870, 871, 875, 900.

   ☐ V.   150, 152, 153.

   **05 - 10784 JLT**

3. TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(G)). IF MORE THAN ONE PRIOR RELATED CASE HAS BEEN FILED IN THIS DISTRICT PLEASE INDICATE THE TITLE AND NUMBER OF THE FIRST FILED CASE IN THIS COURT.

4. HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS COURT?
                                                          YES          NO

5. DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE PUBLIC INTEREST?   (SEE 28 USC §2403)
                                                          YES          (NO)

   IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?
                                                          YES          (NO)

6. IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE 28 USC §2284?
                                                          YES          (NO)

7. DO ALL OF THE PARTIES IN THIS ACTION, EXCLUDING GOVERNMENTAL AGENCIES OF THE UNITED STATES AND THE COMMONWEALTH OF MASSACHUSETTS ("GOVERNMENTAL AGENCIES"), RESIDING IN MASSACHUSETTS RESIDE IN THE SAME DIVISION? - (SEE LOCAL RULE 40.1(D)).
                                                          (YES)        NO

   A. IF YES, IN WHICH DIVISION DO ALL OF THE NON-GOVERNMENTAL PARTIES RESIDE?
      (EASTERN DIVISION)        CENTRAL DIVISION          WESTERN DIVISION

   B. IF NO, IN WHICH DIVISION DO THE MAJORITY OF THE PLAINTIFFS OR THE ONLY PARTIES, EXCLUDING GOVERNMENTAL AGENCIES, RESIDING IN MASSACHUSETTS RESIDE?
      EASTERN DIVISION          CENTRAL DIVISION          WESTERN DIVISION

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME _Michael A. Albert_
ADDRESS _Wolf Greenfield and Sacks, P.C., 600 Atlantic Ave, Boston MA 02210_
TELEPHONE NO. _617-646-8000_

(Cover sheet local.wpd - 11/27/00)