IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUECHIP TECHNOLOGIES LTD.,

   Plaintiff

v.

HCA-INFORMATION TECHNOLOGY &
SERVICES, INC.,

   Defendant.

Civil Action No. 05-10784 JLT

**EMERGENCY HEARING REQUESTED**

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

HCA-INFORMATION TECHNOLOGY
& SERVICES, INC.,
By its attorneys,

J. William Codinha, BBO No. 087740
Timothy W. Mungovan, BBO No. 600702
Deborah C. Burton, BBO No. 650737
Stephen M. LaRose, BBO No. 654507
NIXON PEABODY LLP
100 Summer Street
Boston, MA 02110
(617) 345-1000

Dated: June 27, 2005

## Table of Contents

Page

TABLE OF AUTHORITIES ............................................................................................... iii

PRELIMINARY STATEMENT .......................................................................................... - 1 -

STATEMENT OF FACTS ................................................................................................... - 4 -

STANDARD FOR INJUNCTIVE RELIEF ........................................................................ - 16 -

ARGUMENT........................................................................................................................ - 17 -

HCA-IT&S IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND A
PRELIMINARY INJUNCTION TO PREVENT BLUECHIP FROM TERMINATING
SUPPORT FOR THE SUPPORTED PROGRAMS ............................................................ - 17 -

    I.      HCA-IT&S WILL SUFFER IRREPARABLE HARM IF BLUECHIP
          TERMINATES SUPPORT BECAUSE THE FUNCTIONALITY OF THE
          SUPPORTED PROGRAMS WILL LIKELY ERODE, PUTTING THE HEALTH
          AND SAFETY OF PATIENTS AT RISK. .................................................. - 17 -

    II.     HCA-IT&S IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS
          BECAUSE BLUECHIP HAS BREACHED THE SUPPORT AGREEMENT BY
          IMPOSING ADDITIONAL CHARGES FOR SUPPORT THAT IS ALREADY
          INCLUDED IN THE SUPPORT AGREEMENT AND THEN THREATENING
          TO TERMINATE SUPPORT BASED ON NONPAYMENT OF THE
          ADDITIONAL CHARGES .......................................................................... - 21 -

    III.    THE BALANCE OF HARDSHIPS WEIGHS IN FAVOR OF HCA-IT&S
          BECAUSE THE HARM TO HCA-IT&S FROM BLUECHIP'S TERMINATION
          OF SUPPORT FOR THE SUPPORTED PROGRAMS IS FAR GREATER
          THAN ANY HARM THAT WILL BE CAUSED TO BLUECHIP BY A
          PRELIMINARY INJUNCTION………………………………………. -29-

    IV.    THE PUBLIC INTEREST SUPPORTS GRANTING A PRELIMINARY
          INJUNCTION BECAUSE BLUECHIP'S TERMINATION OF SUPPORT FOR
          THE SUPPORTED PROGRAMS WOULD JEOPARDIZE THE HEALTH AND
          SAFETY OF PATIENTS RECEIVING MEDICAL CARE AT THE
          HOSPITALS SERVED BY HCA-IT&S. ..................................................... - 30 -

CONCLUSION...................................................................................................................... - 30 -

# TABLE OF AUTHORITIES

## CASES

*Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451 (1991) ....................................28

*CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618 (1st Cir. 1995) ......20, 28

*Chambers v. Coventry Health Care of La., Inc.*, 318 F. Supp. 2d 382 (E.D. La. 2004) ...............................................................................................................................19

*Commerce & Indus. Ins. Co. v. Bayer Corp.*, 433 Mass. 388 (2001) ................................27

*Computer Assocs. Int'l, Inc. v. State Street Bank & Trust Co.*, 789 F. Supp. 470 (D. Mass. 1992)...........................................................................................17, 18, 29, 30

*Detroit Med. Ctr. v. GEAC Computer Sys., Inc.*, 103 F. Supp. 2d 1019 (E.D. Mich. 2000).....................................................................................................19, 21, 30

*Digital Equip. Corp. v. AltaVista Tech., Inc.*, 960 F. Supp. 456 (D. Mass. 1997) ............24

*Dynamics Corp. of Am. v. Int'l Harvester Co.*, 429 F. Supp. 341 (S.D.N.Y. 1977)..........27

*EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577 (1st Cir. 2001) ..........................16

*Fairview Mach. & Tool Co. v. Oakbrook Int'l, Inc.*, 77 F. Supp. 2d 199 (D. Mass. 1999) ......................................................................................................................20, 28, 29

*Garbincius v. Boston Edison Co.*, 621 F.2d 1171 (1st Cir. 1980) ....................................24

*i.Lan Sys., Inc. v. NetScout Serv. Level Corp.*, 183 F. Supp. 2d 328 (D. Mass. 2002) ...................................................................................................................................27

*JOM, Inc. v. Adell Plastics, Inc.*, 193 F.3d 47 (1st Cir. 1999)...........................................26

*Jaffe v. Sharp*, 463 F. Supp. 222 (D. Mass. 1978)........................................................17, 19

*Lawson v. Affirmative Equities Co., L.P.*, 341 F. Supp. 2d 51 (D. Mass. 2004) ...............27

*Mayer v. Wing*, 922 F. Supp. 902 (S.D.N.Y. 1996)...........................................................19

*Mediplex of Mass., Inc. v. Shalala*, 39 F. Supp. 2d 88 (D. Mass. 1999)................16, 19, 30

*Novacore Techs., Inc. v. GST Communications Corp.*, 20 F. Supp. 2d 169 (D. Mass. 1998)..................................................................................................................27

*Novel Iron Works, Inc. v. Wexler Constr. Co.*, 26 Mass. App. Ct. 401 (1988)..................27

*Olson v. Wing*, 281 F. Supp. 2d 476 (E.D.N.Y. 2003)..................................................19, 30

*Pro Am Sports Sys., Inc. v. Larry Simone, Inc.*, 738 F.2d 440 (6th Cir. 1984)..................29

*Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43 (1st Cir. 1986) .......................................20, 28

*VMark Software, Inc. v. EMC Corp.*, 37 Mass. App. Ct. 610 (1994)................................27

*Victory Bottle Capping Mach. Co. v. O. & J. Mach. Co.*, 280 F. 753 (1st Cir.
1922) ........................................................................................................................24, 25

## TREATISES

11 Samuel Williston, *A Treatise on the Law of Contracts* § 32:9 (4th ed. 1999)...... 24 - 25

## STATUTES

Fed. R. Civ. P. 65 ....................................................................................................................1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUECHIP TECHNOLOGIES LTD.,

          Plaintiff

v.

HCA-INFORMATION TECHNOLOGY &
SERVICES, INC.,

          Defendant.

Civil Action No. 05-10784 JLT

**EMERGENCY HEARING REQUESTED**

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Defendant HCA-Information Technology Services, Inc. ("HCA-IT&S") respectfully

submits this memorandum in support of its emergency motion, pursuant to Fed. R. Civ. P. 65, for

a temporary restraining order and preliminary injunction preventing Plaintiff BlueChip

Technologies Ltd. ("BlueChip") from terminating critical support for software programs that

facilitate the electronic storage and retrieval of patient medical information. BlueChip has

threatened to terminate its support on July 5, 2005, thereby placing the health and safety of

thousands of medical patients at risk.

## PRELIMINARY STATEMENT

HCA-IT&S provides information technology and services to more than one hundred

hospitals and healthcare facilities throughout the country serving thousands of patients. HCA-

IT&S licenses certain software programs, including MedArchive and Object Archive (the

"Supported Programs"), from BlueChip that enable physicians and other health care providers to

electronically retrieve patient medical information. Because error-free electronic access to

patient medical information is critical to patient care, HCA-IT&S entered into a Support

- 1 -

Agreement with BlueChip pursuant to which BlueChip has been providing support to HCA-IT&S since January 2002.

BlueChip has now placed the health and safety of thousands of medical patients at risk. On June 22, 2005, BlueChip informed HCA-IT&S that it is terminating support for the Supported Programs on July 5, 2005. Without BlueChip's support, the functionality of the Supported Programs will likely erode. *"If BlueChip's support is terminated, there is substantial risk that the Hospitals served by HCA-IT&S will be unable to retrieve electronically the archived patient medical information, which includes historical physician's orders, visit summaries, and nursing notes."*[1] *"In the event that archived medical information becomes unavailable to healthcare providers at the Hospitals, for any amount of time, the health and safety of patients at the Hospitals could be placed at risk."*[2]

As these circumstances indicate, BlueChip has substantial leverage over HCA-IT&S. Adding to BlueChip's leverage is the fact that HCA-IT&S is handcuffed to BlueChip for support. HCA-IT&S cannot support the Supported Programs itself and there are no third-party vendors that HCA-IT&S could retain for support in place of BlueChip. Moreover, it would take six months for HCA-IT&S to migrate from MedArchive, and at least eighteen months to migrate from Object Archive, onto a new software platform.

BlueChip has exploited its leverage by imposing a new, additional monthly charge of $83,201.000 for support, which is an increase of 220% over what HCA-IT&S has already been paying for the last year. This new charge is based on a dubious contract interpretation that is the subject of BlueChip's Complaint in this very case. Thus, BlueChip has demanded payment of

---

[1]  Affidavit of William E. Fitzgerald, Assistant Vice President of Technology Services for HCA-IT&S, dated June 24, 2005 ("Fitzgerald Aff."), ¶ 34.

[2]  Affidavit of Phillip P. Brown, M.D. dated June 24, 2005 ("Brown Aff."), ¶ 10.

this additional charge, even though the basis for it is disputed by HCA-IT&S, and BlueChip's

interpretation has not been validated by this Court. Moreover, now that HCA-IT&S has objected

to paying this new charge (even though HCA-IT&S has paid the undisputed charge of

$38,124.00 per month), BlueChip has threatened to terminate support.

Based on the foregoing and as set forth in greater detail below, HCA-IT&S is entitled to a

preliminary injunction preventing BlueChip from terminating support – on less than two weeks

notice – because:

- HCA-IT&S will suffer irreparable harm if BlueChip terminates support.
  HCA-IT&S does not have the knowledge or skill to ensure the error-free
  functioning of the Supported Programs without BlueChip. Given that the
  Supported Programs are used to facilitate the electronic storage and
  retrieval of patient medical information, any interruption in HCA-IT&S'
  use of the Supported Programs puts at risk the health and safety of
  thousands of patients at the one hundred plus Hospitals served by HCA-
  IT&S.

- HCA-IT&S continues to pay the contractual support fees.

- BlueChip has attempted to alter the status quo by charging an additional
  220% for support that has been included in the Support Agreement since
  January 2002, based on a disputed legal theory that is the subject of
  BlueChip's Complaint, and threatening to terminate support based on
  nonpayment of the additional charges.

- BlueChip may argue that HCA-IT&S can avoid irreparable harm by
  paying the disputed amount of $83,201.00 per month. Such an argument
  turns the law on its head. Because the disputed amount is based on
  BlueChip's recently concocted interpretation of the License Agreement,
  and is the subject of Blue Chip's Complaint, Blue Chip is essentially
  seeking to "front load" its damages before this Court has determined that
  BlueChip is entitled to anything more than what the Support Agreement
  allows, which is what HCA-IT&S is paying.

- HCA-IT&S has a strong likelihood of prevailing on the merits. BlueChip
  has breached the Support Agreement, and the covenant of good faith and
  fair dealing, by unilaterally and fundamentally changing how it charges
  for support under the Support Agreement – based on its strained theory of
  "unauthorized users" – despite HCA-IT&S' continued compliance with
  the Support Agreement.

- 3 -

- The balancing of the equities weighs strongly in HCA-IT&S' favor. The termination of support jeopardizes the health and safety of thousands of patients while BlueChip suffers little or no harm because HCA-IT&S has paid, and will continue to pay, the full contractual amount – $38,124.00 – for each month of support and HCA-IT&S' support requirements have remained static, or decreased, since January 2002. Moreover, BlueChip will not suffer any damages from the injunction because HCA-IT&S will post an injunction bond covering the disputed amount.

- The public interest will be served by the issuance of an injunction because BlueChip's termination of support would jeopardize the health and safety of patients receiving medical care at the Hospitals served by HCA-IT&S.

## STATEMENT OF FACTS

### HCA-IT&S

HCA-IT&S is a wholly-owned indirect subsidiary of HCA Inc. ("HCA"). Affidavit of Timothy W. Partlow dated June 24, 2005 ("Partlow Aff."), ¶ 4. HCA is a holding company whose affiliates or subsidiaries own, manage, or operate hospitals and other healthcare facilities, such as freestanding surgery centers and diagnostic and imaging centers. *Id.* HCA-IT&S, as its name implies, provides information technology and services to those hospitals and healthcare facilities (collectively, the "Hospitals"). *Id.* at ¶ 6.

### The MEDITECH System

Among other things, HCA-IT&S provides a service to the Hospitals that enables physicians and other healthcare providers to electronically retrieve patient medical information, including physician-dictated reports, nursing documentation, and other details related to medical care. Fitzgerald Aff., ¶ 7; Brown Aff., ¶ 8. The software program that controls most of this electronic medical recordkeeping function is known as the MEDITECH Clinical Patient Care

System (the "MEDITECH System"). Fitzgerald Aff., ¶ 7.[3]  Once patient medical information

reaches a certain "age" in the MEDITECH System, it is electronically archived.  *Id.*  While the

"age" at which medical information is archived can vary, it is commonly archived on a rolling

basis as early as forty-five (45) days from the patient's discharge date (for inpatient services) or

service date (for outpatient services).  *Id.*

## The MedArchive Software Program

The MedArchive software program ("MedArchive") permits electronic retrieval and long

term storage of archived patient medical information at the request of the MEDITECH System.

*Id.* at ¶ 9.  MedArchive operates on servers owned and operated by HCA-IT&S.  *Id.*  These

servers are housed in HCA-IT&S' eight data centers.  *Id.*

When a physician or healthcare provider using the MEDITECH System at one of the

Hospitals needs to review a patient's electronic medical information, the MEDITECH System

determines the location of the required information (either on the live MEDITECH System or on

the back-end MedArchive server).  *Id.* at ¶ 11.  If any of the medical information is archived on a

MedArchive server, then the MEDITECH System makes a computer-to-computer request to

MedArchive to return the medical information back to the MEDITECH System.  *Id.*  Once the

medical information is returned to the MEDITECH System, it is presented back to the healthcare

provider in the MEDITECH System environment.  *Id.*  Likewise, if the MEDITECH System

determines that certain medical information is eligible for archiving based upon its aging criteria,

an automated request to store patient medical information is sent by the MEDITECH System to

the appropriate MedArchive server.  *Id.*

---

[3]    The MEDITECH System is owned by Medical Information Technology, Inc. (commonly known as MediTech). Fitzgerald Aff., ¶ 7.

Access to MedArchive and the medical information stored on the MedArchive servers is accomplished by the computer-to-computer interaction between the MedArchive servers and the servers operating the MEDITECH System. *Id.* This machine-to-machine interaction between the MEDITECH System and MedArchive is the only means of standard access to archived patient medical information stored on the MedArchive servers. *Id.* There is no user interface that enables healthcare providers to access MedArchive directly. *Id.*

Healthcare providers have no access whatsoever to MedArchive software code (whether object code or source code) and such code is not made available to any healthcare providers. *Id.* Healthcare providers also have no <u>direct</u> access to MedArchive, its functionality, or the data stored on the MedArchive servers. *Id.* Rather, the interaction between the MEDITECH System and MedArchive is done exclusively through machine-to-machine communication, with no user knowledge as to the location or techniques employed by MedArchive. *Id.* Thus, the healthcare provider who reviews electronic patient medical information does not actually "use" MedArchive or interface directly with it. *Id.* Indeed, the healthcare provider is not even aware of the interaction between the MEDITECH System and MedArchive. *Id.*; Brown Aff., ¶ 9.

## The Data General Agreement And The Divested Facilities

In the mid-1990's, Columbia/HCA Information Services (n/k/a HCA-IT&S) ("Columbia/HCA") had an agreement with Data General Corporation ("Data General"), which owned MedArchive at that time, pursuant to which Columbia/HCA could operate MedArchive on servers within its eight data centers and Data General would provide support for MedArchive (the "Data General Agreement"). Partlow Aff., ¶ 10.

Beginning in the late 1990's, HCA began to pursue a strategy of divesting itself of certain Hospitals. *Id.* at ¶ 11. In May 1999, HCA completed the divestiture of Hospitals in two of its

- 6 -

divisions. *Id.* As a result, LifePoint Hospitals, Inc. ("LifePoint") and Triad Hospitals, Inc. ("Triad"), two independent companies, were created. *Id.* Following their divestiture, HCA has, through certain subsidiaries, continued to provide services, including the storage and retrieval of electronic patient information, to LifePoint and Triad. *Id.* at ¶ 12. HCA has also divested itself of other Hospitals. *Id.* at ¶ 13. In some instances, HCA has, through certain subsidiaries, continued to provide services to these divested Hospitals, including information technology and services through HCA-IT&S (the divested Hospitals to which HCA-IT&S has continued to provide services are the "Divested Facilities"). *Id.*

In 1999, Data General was aware that HCA was planning to divest itself of certain Hospitals and that, in certain instances, HCA-IT&S would continue to provide information technology and services, including the storage and retrieval of electronic patient information, to these divested Hospitals on an ongoing basis. *Id.* at ¶ 14. Data General and HCA-IT&S agreed that, after the divestitures, HCA-IT&S would continue to pay the same licensing and support fees to Data General for all of Data General's products and services for which HCA-IT&S had paid prior to the divestitures. *Id.* at ¶ 15. Thus, where HCA-IT&S continued to provide information technology and services to a divested Hospital, HCA-IT&S would continue to pay the same fees to Data General that it paid before the divestiture and Data General would not seek to charge the divested hospital directly for its programs or support. *Id.*

## HCA-IT&S' Agreements With BlueChip

In December 2000 or January 2001, BlueChip purchased MedArchive from EMC Corporation ("EMC"), which had recently purchased the assets of Data General. *Id.* at ¶ 16. From its earliest interactions with HCA-IT&S, BlueChip was aware that HCA-IT&S was running MedArchive on seventy-six (76) servers, each of which was dedicated to a certain

- 7 -

geographic market. *Id.* at ¶ 17. BlueChip also knew that HCA-IT&S had no idea how many Hospitals were being served by each server. *Id.* Thus, BlueChip was aware that the Data General Agreement was a "server-based" agreement, that is, the use and pricing was based on the number of servers running the software, not the number of Hospitals archiving data, or some other metric. *Id.*

HCA-IT&S subsequently entered into two agreements concerning the use and support of certain software programs: the Software License Agreement (the "License Agreement") and the Master Software Support Agreement (the "Support Agreement"). *Id.* at ¶ 19; Affidavit of Deborah C. Burton, Esq. dated June 27, 2005 ("Burton Aff."), Ex. 1, 2. HCA-IT&S executed both of these Agreements on December 6, 2001. Partlow Aff., ¶ 19. BlueChip executed both of these Agreements on or about January 3, 2002. *Id.*

The License Agreement governs the use of various BlueChip software programs, which are listed on Exhibit B to the License Agreement (the various software products covered by the License Agreement are, together, the "Licensed Software"). *Id.* at ¶ 20. MedArchive is included among the Licensed Software listed in Exhibit B. *Id.* The specific servers on which HCA-IT&S is authorized to run MedArchive are listed in Exhibit A to the License Agreement. *Id.*

Exhibit A is entitled "List of Designated Equipment" and "HCA MedArchive Systems by Regional Data Centers and CPCS Networks." *Id.* Exhibit A lists seventy-six (76) MedArchive servers and the MEDITECH System Networks that correspond to each of the MedArchive servers. The MEDITECH System Networks are identified by, among other things, the "market network" and "time zone," while the MedArchive servers are identified by, among other things, "serial number." *Id.*

Based on the terms of the License Agreement, including the definition of "Network" in the License Agreement and the corresponding information set forth on Exhibit A to the License Agreement, HCA-IT&S understood and believed at all times that as long as the archived medical information that was stored on the MedArchive servers was available only to the MEDITECH System Networks, HCA-IT&S was in compliance with the License Agreement, regardless of whether a MEDITECH System Network serviced Divested Facilities. Indeed, in January 2002, when BlueChip executed the License Agreement, some of the MEDITECH System Networks listed on Exhibit A were exclusively servicing Divested Facilities. Fitzgerald Aff., ¶ 12.

HCA-IT&S has never operated MedArchive on more than the seventy-six (76) servers listed in Exhibit A. *Id.* at ¶ 25. Currently, HCA-IT&S operates MedArchive on seventy-three (73) of those servers, and a seventy-fourth server operates BlueChip's next generation archive software solution, which is a collection of Windows-based programs including the programs that are marketed as Object Archive and Medscan 2000 (Object Archive and Medscan 2000 are, together, "Object Archive"). *Id.*

The Support Agreement concerns BlueChip's obligations to provide support to HCA-IT&S in connection with the Licensed Software. Partlow Aff. at ¶ 21. Exhibit C to the License Agreement is entitled "Supported Programs" and identifies programs for which BlueChip agreed to provide support (the "Supported Programs") and the cost of support for the programs. *Id.* at ¶ 21. Exhibit C also identifies the quantity (as stated in the agreement: "QTY") of the Supported Programs and the "Unit Charge" for the Supported Programs. *Id.* With respect to MedArchive, Exhibit C lists the quantity of Supported Programs as "76" and the Unit Charge as $330.00 per month. *Id.* at ¶ 22. Based on the number of servers running MedArchive, and the per Unit

Charge for each server, the monthly charge for support for MedArchive on all seventy-six (76) servers in January 2002 was $25,080.00. *Id.*

## Object Archive

In May and June 2003, the archive solution for HCA-IT&S' Jacksonville, Florida market was migrated to a new server and the software was converted to Object Archive (the "Jacksonville Server"). Fitzgerald Aff., ¶ 27.

## BlueChip's Support

Since January 2002, BlueChip has provided support to HCA-IT&S pursuant to the Support Agreement.[4] Partlow Aff., ¶ 23. This support has included the development of code fixes for program malfunctions, data restoration and file recovery, and programming changes to correct software malfunctions. Fitzgerald Aff., ¶ 36. Since January 2002, HCA-IT&S has formally requested support from BlueChip on approximately ninety-three (93) occasions. *Id.* at ¶ 29. Of those ninety-three (93) support calls, seventy-nine (79) related to support for Object Archive and related system functions. *Id.* Since January 1, 2004, HCA-IT&S has made one (1) request for support in connection with MedArchive: on September 13, 2004. *Id.* at ¶ 30.

## Extension Of The Support Agreement

During February, March, and April 2004, BlueChip and HCA-IT&S engaged in discussions concerning the future of their business relationship. Partlow Aff., ¶ 27. BlueChip wanted HCA-IT&S to replace MedArchive with the next generation software product (Object Archive), which would have required HCA-IT&S to purchase new servers on which to operate the software. *Id.* Meanwhile, HCA-IT&S informed BlueChip that it was considering replacing BlueChip's software with technology offered by a competitor. *Id.*

---

[4] BlueChip has been providing support for Object Archive since May 2003. Partlow Aff., ¶ 25.

In March 2004, BlueChip informed HCA-IT&S that it wanted to end its support for MedArchive but offered to continue to provide support if HCA-IT&S would commit to a multi-year extension of the Support Agreement through December 31, 2006. *Id.* at ¶ 28. At that time, BlueChip also provided HCA-IT&S with a new Exhibit C to the License Agreement, entitled "Exhibit C Software Support Price Schedule" ("New Exhibit C"). *Id.* Based on subsequent discussions and written communications between HCA-IT&S and BlueChip in March and April 2004, HCA-IT&S understood and believed that BlueChip offered to continue to provide support for MedArchive if HCA-IT&S would agree to extend the Support Agreement through December 31, 2006. *Id.* Accordingly, on or about May 28, 2004, HCA-IT&S executed New Exhibit C. *Id.*; Burton Aff., Ex. 2.

New Exhibit C provides, in pertinent part, that the parties agree "to an extended contract term beginning April 1, 2004 and ending December 31, 2006." Partlow Aff., ¶ 29. New Exhibit C further states that "The pricing listed above is effective July 1, 2004 through June 30, 2005 and is subject to a limited annual price increase on the anniversary date, in accordance with the Master Software Support Agreement (#BCT 601 dated 12/06/01)." *Id.* Pursuant to New Exhibit C, BlueChip increased the price of support for MedArchive to \$28,828.43 per month and the total monthly price for all Supported Programs to \$32,564.23.[5] *Id.* at ¶ 30. Pursuant to New Exhibit C, each month from June 2004 to April 2005, BlueChip has sent an invoice to HCA-

---

[5]     Through 2004, BlueChip increased its prices for support by approximately 5% each year. Partlow Aff., ¶ 42. In July 2002, BlueChip increased the total monthly cost of support for the Supported Programs to \$29,747 (from \$28,330.00). *Id.* at ¶ 23. In July 2003, BlueChip increased the total monthly cost of support for the Supported Programs to \$30,936.36. *Id.*

- 11 -

IT&S seeking payment of $32,564.23 for the next month's support and, each month, HCA-IT&S has paid the invoices. *Id.* at ¶ 31.[6]

### BlueChip's Claim Of "Unauthorized Users"

In December 2004, apparently frustrated by its inability to convince HCA-IT&S to convert from MedArchive to the costly Object Archive, BlueChip embarked on an aggressive new sales tactic. *See* Burton Aff., Ex. 6. In a letter dated December 17, 2004, BlueChip claimed for the first time that HCA-IT&S was violating the License Agreement by permitting the Divested Facilities to access archived data stored on the MedArchive servers. Partlow Aff., ¶ 32; Burton Aff., Ex. 6. BlueChip also intimated that it might refuse to continue to provide support if these issues could not be "resolved" by "no later than January 31, 2005." Burton Aff., Ex. 6.

BlueChip's allegations came as a shock to HCA-IT&S. *See* Partlow Aff., ¶¶ 33-36. As HCA-IT&S explained in letters back to BlueChip, from the very beginning of its relationship with BlueChip, HCA-IT&S believed that it had an agreement with BlueChip whereby HCA-IT&S could provide information technology and services to the Hospitals – including the Divested Facilities – under the terms of the License Agreement and the Support Agreement without incurring additional costs. *Id.* at ¶ 33; Burton Aff., Ex. 8, 11, 18. In other words, HCA-IT&S believed that it had a server-based License Agreement and Support Agreement; that is, BlueChip was charging HCA-IT&S for support for MedArchive based on the number of servers that were running MedArchive, not the number of Hospitals to which HCA-IT&S was providing information and technology services. Partlow Aff., ¶ 33. In short, HCA-IT&S believed that it had an agreement with BlueChip that HCA-IT&S would be able to continue to provide services

---

[6]  Indeed, every month from January 2002 to May 2005, BlueChip has sent an invoice to HCA-IT&S for the next month's support and HCA-IT&S has paid the invoice in a timely fashion. *Id.* at ¶ 26; Burton Aff., Ex. 4 and 5.

to the Divested Facilities at no additional cost over and above the payments made pursuant to the License Agreement and the Support Agreement. *Id.* at ¶ 34; Fitzgerald Aff. ¶12.

Notwithstanding BlueChip's claims in December 2004 that HCA-IT&S was violating the terms of the License Agreement, and notwithstanding its implied threat to terminate support, BlueChip continued to send monthly invoices for $32,564.00 to HCA-IT&S for support for the Supported Programs, HCA-IT&S continued to pay the invoices, and BlueChip continued to provide support. Partlow Aff. at ¶ 38.

**BlueChip Files Suit Against HCA-IT&S**

On April 19, 2005, BlueChip filed suit against HCA-IT&S alleging, among other things, that HCA-IT&S breached the License Agreement by permitting the Divested Facilities to access archived patient medical information stored on the MedArchive servers. *See* Complaint, ¶¶ 92, 103, 110.

**BlueChip's Attempts To Charge For "Unauthorized Users" And Threats To Terminate Support**

Beginning in May 2005, BlueChip tried yet another aggressive tactic to put pressure on HCA-IT&S: BlueChip began threatening to disrupt support. Partlow Aff., ¶¶ 39-40. On May 1, 2005, BlueChip sent a letter to HCA-IT&S claiming for the first time that the Support Agreement had expired on June 30, 2004 and that HCA-IT&S was "in an 'at-will' relationship" with BlueChip for support. *Id.* at ¶ 39; Burton Aff., Ex. 7. BlueChip also claimed that it had not agreed (in May 2004) to extend the Support Agreement through December 31, 2006 pursuant to New Exhibit C because of the alleged disagreement over "unauthorized users" that BlueChip first raised in December 2004. *Id.*

In its May 1, 2005 letter, BlueChip also claimed for the first time that it was entitled to charge HCA-IT&S for support for the Divested Facilities – which BlueChip considered

- 13 -

"unauthorized users." *Id.* BlueChip attached to its letter yet another version of "Exhibit C" – this one for a "One Year Support Agreement Effective: June 1, 2005 to May 31, 2006." *Id.* This latest Exhibit C distinguished for the first time between what BlueChip termed "HCA Affiliates" and "HCA-Non-Affiliates." *Id.* In addition to trying to raise its prices effective June 1, 2005, BlueChip also sought an additional monthly payment of $83,201.00 from HCA-IT&S for "MedArchive Support" for "HCA-Non-Affiliates." *Id.* Moreover, as with other letters from BlueChip where BlueChip was claiming wrongdoing by HCA-IT&S, and impliedly threatening HCA-IT&S, BlueChip attempted to "up-sell" HCA-IT&S onto BlueChip's next generation product, Object Archive. *Id.*; *see also* Burton Aff., Ex. 6, 17.

On May 19, 2005, HCA-IT&S responded to BlueChip's May 1, 2005 letter and explained, among others things, that HCA-IT&S believed the Support Agreement remained in force and that BlueChip had no right to impose additional charges for support for the Divested Facilities under the terms of the License Agreement and Support Agreement. Partlow Aff., ¶ 41; Burton Aff., Ex. 8. HCA-IT&S also explained that, under the terms of the Support Agreement, BlueChip could not increase its prices without providing sixty days written notice. *Id.*

On May 20, 2005, BlueChip responded to HCA-IT&S' May 19, 2005 letter and now, rather than claiming that the Support Agreement had expired (as it had done in its May 1, 2005 letter), BlueChip claimed that HCA-IT&S was "in material breach" of the Support Agreement by, among other things, "threatening to materially breach its support and maintenance agreement contract with BlueChip by failing to timely pay for support and maintenance services." Partlow Aff., ¶ 41; Burton Aff., Ex. 9. BlueChip then repeatedly invoked the terms of the Support

- 14 -

Agreement to justify its price increases for support, which BlueChip now said would be effective on July 1, 2005 (in apparent observance of the 60 day notice requirement). *Id.*[7]

On May 31, 2005, HCA-IT&S responded to BlueChip's May 20, 2005 letter and explained, among other things, that HCA-IT&S would seek immediate legal relief if BlueChip attempted "to terminate support prematurely or otherwise interfere with HCA-IT&S' use of the Licensed Software" because such actions "could jeopardize the health and safety of patients receiving medical care at the facilities served by HCA-IT&S." Partlow Aff., ¶ 42; Burton Aff., Ex. 12.

On June 1, 2005, BlueChip issued an invoice to HCA-IT&S seeking a total payment of $121,325.00 for support for the Supported Programs for the time period of July 1, 2005 to July 31, 2005. Partlow Aff., ¶ 42; Burton Aff., Ex. 13. BlueChip sought a monthly payment of $83,201.00 for "MedArchive Support" for what it called "HCA-Non-Affiliates." *Id.* BlueChip also listed separate charges for each of the Supported Programs, including a charge for "MedArchive Support" for what BlueChip called "HCA-Affiliates." *Id.* BlueChip also imposed substantial price increases on each of the Supported Programs, including a price increase of more than 15% over last year's price on the core product of MedArchive Support (and even though prior year increases for MedArchive support were approximately 5%). *Id.*

On June 17, 2005, HCA-IT&S issued a check to BlueChip in the amount of $38,124.00 as full payment on BlueChip's invoice dated June 1, 2005. Partlow Aff., ¶ 44; Burton Aff., Ex. 14. In the letter that accompanied HCA-IT&S' payment, HCA-IT&S explained that the payment covered each of the Supported Programs and BlueChip's price increases. Partlow Aff.,

---

[7]    On or about May 10, 2005, BlueChip issued a new invoice to HCA-IT&S seeking payment of $32,564.00 for support for the period of June 1 to June 30, 2005. *Id.* at ¶ 40; Burton Aff., Ex. 10. Shortly thereafter, HCA-IT&S paid this invoice with a check in the amount of $32,564.00. Partlow Aff., ¶ 40; Burton Aff., Ex. 11.

¶ 44; Burton Aff., Ex. 15. HCA-IT&S further explained that it objected to BlueChip's attempts to charge for what BlueChip called "HCA-Non-Affiliates" and, therefore, HCA-IT&S declined to pay such charges. *Id.* HCA-IT&S indicated once again that it would seek immediate legal relief if BlueChip attempted to terminate support. *Id.*

On June 22, 2005, BlueChip sent a letter to HCA-IT&S (dated June 23, 2005) demanding payment of an additional $83,201.00 by July 5, 2005 (the "Termination Notice"). Partlow Aff., ¶ 45; Burton Aff., Ex. 16. The Termination Notice further stated that if HCA-IT&S does not pay the disputed amount of $83,201.00 by July 5, 2005, then "BlueChip intends to exercise its rights and suspend performance under the Master Software Support Agreement." *Id.* Based on the Termination Notice, HCA-IT&S understands and believes that BlueChip will suspend or terminate support for all Supported Programs, including MedArchive and Object Archive, on July 5, 2005 despite the fact that HCA-IT&S has paid the contracted-for amount of $38,124.00. *Id.*

## STANDARD FOR INJUNCTIVE RELIEF

Preliminary injunctive relief is warranted where: (1) the movant has a likelihood of success on the merits; (2) the movant would suffer irreparable harm absent a preliminary injunction; (3) issuance of a preliminary injunction is justified by the balance of the equities; and (4) the public interest would be served by issuance of a preliminary injunction. *See, e.g., EF Cultural Travel BV v. Explorica, Inc.,* 274 F.3d 577, 581 (1st Cir. 2001); *Mediplex of Mass., Inc. v. Shalala*, 39 F. Supp. 2d 88, 94 (D. Mass. 1999). Preliminary injunctive relief in cases where the termination of services would jeopardize the health and safety of patients is appropriate when these factors have been shown. *See, e.g., Mediplex of Mass., Inc.*, 39 F. Supp. 2d at 98-101

(granting preliminary injunction); *Jaffe v. Sharp*, 463 F. Supp. 222, 229-30 (D. Mass. 1978)

(same).

## ARGUMENT

### HCA-IT&S IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION TO PREVENT BLUECHIP FROM TERMINATING SUPPORT FOR THE SUPPORTED PROGRAMS.

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, HCA-IT&S is entitled to a

temporary restraining order and a preliminary injunction preventing BlueChip from terminating

support for the Supported Programs because HCA-IT&S will suffer irreparable harm in the

absence of an injunction and HCA-IT&S is likely to succeed on the merits of its claims.

### I. HCA-IT&S WILL SUFFER IRREPARABLE HARM IF BLUECHIP TERMINATES SUPPORT BECAUSE THE FUNCTIONALITY OF THE SUPPORTED PROGRAMS WILL LIKELY ERODE, PUTTING THE HEALTH AND SAFETY OF PATIENTS AT RISK.

#### A. HCA-IT&S Does Not Have The Knowledge Or Skill To Ensure The Error-Free Functioning Of The Supported Programs.

In *Computer Associates*, an action for breach of contract and copyright infringement that

bears a striking resemblance to the present case, the Court (Keeton, J.) issued a preliminary

injunction to prevent the plaintiff software company, Computer Associates, from terminating

software support for the defendant customer, State Street Bank. *Computer Assocs. Int'l, Inc. v.*

*State Street Bank & Trust Co.*, 789 F. Supp. 470 (D. Mass. 1992). Specifically, the Court found

that State Street Bank was likely to suffer irreparable harm if the preliminary injunction was not

allowed because:

> First, in the absence of maintenance support, the functionality of the Datacom
> program (and others) is likely to erode. Second, even if the Datacom program
> were to remain functional, the Bank and its customers could not continue to rely
> on the availability of that program. As a result, the Bank's business and business
> reputation would be substantially harmed.

*Id.* at 471-72.

Here, as in *Computer Associates,* HCA-IT&S will suffer irreparable harm if BlueChip terminates support for the Supported Programs because HCA-IT&S does not have the knowledge or skill to ensure the error-free functioning of the Supported Programs. Fitzgerald Aff., ¶ 33. First, the functionality of the Supported Programs is likely to erode without BlueChip's support. *Id.* Second, even if MedArchive remains functional, HCA-IT&S and the Hospitals could not continue to rely on the availability of the Supported Programs. *Id.* at ¶ 35. As a result, there is a substantial risk that the Hospitals would be unable to electronically retrieve their archived patient medical information (including physician's orders, visit summaries, and nursing notes), which in turn could place the health and safety of thousands of patients at risk. *Id.* at ¶ 34; Brown Aff., ¶ 10.

HCA-IT&S has no viable alternatives to BlueChip. *Id.* at ¶ 33. HCA-IT&S does not have the capability to support MedArchive on its own. *Id.* BlueChip's historical knowledge of the Supported Programs' internal structure and operation, together with BlueChip's exclusive access to the source code – which is crucial for support – makes it impractical for HCA-IT&S to effectively support MedArchive without BlueChip's assistance. *Id.* There are also no third-party vendors that HCA-IT&S could retain for support in place of BlueChip. *Id.*

HCA-IT&S also cannot simply "buy" new software "off the shelf" to replace the Supported Programs. *Id.* at ¶ 36. Given the breadth of operations -- the Supported Programs currently run on seventy-four (74) servers (seventy-three (73) running MedArchive and one (1) running Object Archive) which handle data for thousands of patients -- and the complexity of the task, HCA-IT&S would need six months to migrate from MedArchive and at least eighteen months to migrate from Object Archive. *Id.* at ¶ 36.

In circumstances such as these, where the health and safety of patients is at risk, courts in this circuit have repeatedly issued preliminary injunctions to prevent this type of irreparable harm. *See, e.g., Mediplex of Mass., Inc.*, 39 F. Supp. 2d at 98 (risk of "transfer trauma" to nursing home patients if forced to move to other facilities constitutes irreparable harm); *Jaffe*, 463 F. Supp. at 229 (risk to health of pregnant women if denied access to medically necessary abortions constitutes irreparable harm). Courts in other circuits have also held that risks to patient health and safety constitute irreparable harm. *See, e.g., Detroit Med. Ctr. v. GEAC Computer Sys., Inc.*, 103 F. Supp. 2d 1019, 1024 (E.D. Mich. 2000) (risk to medical center without proper functioning computer inventory system constitutes irreparable harm); *Chambers v. Coventry Health Care of La., Inc.*, 318 F. Supp. 2d 382, 388-89 (E.D. La. 2004) (risk to cancer patient if denied diagnostic test constitutes irreparable harm); *Olson v. Wing*, 281 F. Supp. 2d 476, 486 (E.D.N.Y. 2003) (risk to Medicaid recipients if denied access to potentially life-saving treatments or medications constitutes irreparable harm); *Mayer v. Wing*, 922 F. Supp. 902, 909 (S.D.N.Y. 1996) (risk to Medicaid home care recipients if denied access to life-sustaining medical services constitutes irreparable harm). Accordingly, HCA-IT&S can demonstrate that BlueChip's termination of support for the Supported Programs will cause irreparable harm by putting the health and safety of patients at risk.

## B. BlueChip Has Attempted To Alter The Status Quo By Charging For Support That Is Already Included In The Support Agreement And Then Threatening To Terminate Support.

BlueChip will likely argue that "there is no irreparable harm here" because HCA-IT&S can simply pay the additional $83,201.00 per month, then seek the return of its own extorted money as damages in connection with its Counterclaim against BlueChip. BlueChip has it backwards. First, BlueChip has attempted to alter the status quo by imposing a new charge of $83,201.00 for support that, up to this point, had been included under the Support Agreement.

- 19 -

Then, BlueChip further attempted to alter the status quo by threatening to terminate support. BlueChip's attempt to "frontload" its damages and obtain the disputed amount in advance of any court determination is an egregious overreaching and transparent violation of the manner in which the American legal system is intended to work.

The theory on which the new charge is based – "unauthorized users" – is the very core of BlueChip's Complaint. See Complaint, ¶¶ 92, 103, 110. Therefore, if and when BlueChip prevails on its theory, BlueChip can recover as damages any additional fees that it proves to be entitled to under the Support Agreement. *See, e.g., CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 620 (1st Cir. 1995) ("The purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs. The court's interim injunctive decree attempts to prevent further injury by maintaining the status quo, thus enhancing the court's ability, if it ultimately finds for the movant, to minimize the harmful effects of the defendant's wrongful conduct.") (internal citations omitted); *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 52-53 (1st Cir. 1986) (granting preliminary injunction to maintain status quo and protect damages remedy pending outcome of contract dispute); *Fairview Mach. & Tool Co. v. Oakbrook Int'l, Inc.*, 77 F. Supp. 2d 199, 205 (D. Mass. 1999) (same).

## II.     HCA-IT&S IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS BECAUSE BLUECHIP HAS BREACHED THE SUPPORT AGREEMENT BY IMPOSING ADDITIONAL CHARGES FOR SUPPORT THAT IS ALREADY INCLUDED IN THE SUPPORT AGREEMENT AND THEN THREATENING TO TERMINATE SUPPORT BASED ON NONPAYMENT OF THE ADDITIONAL CHARGES.[8]

### A.     The Support Agreement Is A "Server-Based" Agreement, Not A "User-Based" Agreement.

The Support Agreement, like the License Agreement and the Data General Agreement, is

a "server-based" Agreement. Partlow Aff., ¶ 33.[9]  The License Agreement authorizes HCA-

IT&S to run the Supported Programs on the seventy-six (76) servers listed in Exhibit A. *Id.* at ¶

20. Fitzgerald Aff. ¶ 21. Similarly, the Support Agreement obligates BlueChip to provide

support for the Supported Programs on those seventy-six (76) servers. Partlow Aff. at ¶ 22.

Under the Support Agreement, HCA-IT&S pays license and support fees based on the

number of servers on which it runs the Supported Programs, not the number of Hospitals to

which HCA-IT&S is providing information technology services. *Id.* at ¶ 22. HCA-IT&S, as an

information technology and services company – as its name implies – is then able to provide

services, including access to the archived patient medical information on the seventy-six (76)

servers, to the Hospitals and Divested Facilities at no additional cost. *Id.* at ¶ 22.

HCA-IT&S' use of the Supported Programs is entirely consistent with the server-based

Support Agreement because all of the persons who have access to the archived patient medical

---

[8]     Given the magnitude of the potential harm, putting the health and safety of thousands of patients at risk, HCA-IT&S should not be required to prove likelihood of success on the merits in this case. *See, e.g., Detroit Med. Ctr.*, 103 F. Supp. 2d at 1023-24 (granting preliminary injunction based on potential harm where, without a proper functioning computer inventory system, plaintiff medical center ran the risk of not having adequate medical supplies and, thus, not being able to render sufficient medical services).

[9]     The Support Agreement works hand-in-glove with the License Agreement. Section B(1) of the Support Agreement states "This Agreement is executed with and subject to the terms and conditions of the Software License Agreement (Form #BCT500), which are incorporated herein by reference and executed by and between CUSTOMER/LICENSEE and BCT." Burton Aff., Ex. 2.

- 21 -

information on HCA-IT&S' servers qualify as Users or Concurrent Users under the License

Agreement. Fitzgerald Aff., ¶ 10-11. Specifically, Section 2(a) of the License Agreement, the

applicable grant clause, states:

> BCT grants LICENSEE's Users and Concurrent Users a personal, non-
> transferable and non-exclusive right to Use the Licensed Software and Third Party
> Software on the Designated Equipment and Network, provided that the number of
> Users, Concurrent Users, and Servers does not exceed the permitted number of
> same for which LICENSEE has paid the applicable Licensed Software license
> fees pursuant to Section 4 of this Agreement.

Burton Aff., Ex. 1.[10] "Users" are defined as "LICENSEE's employees, contractors, and

consultants," whereas "Concurrent Users" are defined as "the number of simultaneous uses, local

or remote (including in a Network) of Licensed Software or any portion thereof." *Id.* "Network"

is defined as "the configuration of Designated Equipment, Server(s) and other devices,

authorized by BCT for use herein, specified in Exhibit A that allow for the flow of data and use

of resources between one another." *Id.*

Therefore, "Users" are narrowly defined by their status as employees of HCA-IT&S. In

contrast, "Concurrent Users" are defined much more broadly, based on the manner in which they

use the software, not who they are. As Mr. Fitzgerald explains in his Affidavit, HCA-IT&S

understood and believed at all times that all of the Hospitals and Divested Facilities qualify as

Concurrent Users under the License Agreement:

> *Exhibit A to the License Agreement is entitled "List of Designated Equipment"*
> *and is further described as "HCA MedArchive Systems by Regional Data Centers*
> *and CPCS Networks." (As set forth above in paragraph 7, "CPCS" stands for*
> *Clinical Patient Care System - which is the MEDITECH System). Each of these*
> *MEDITECH System Networks reflected on Exhibit A is serviced by a*
> *corresponding MedArchive server. This relationship between the MEDITECH*
> *System Network and MedArchive permits the flow of data between the Network*
> *and the MedArchive servers listed in Exhibit A. Based on the definition of*

---

[10] HCA-IT&S, not HCA Inc., is the Licensee under both the License Agreement and the Support Agreement. *Id.* at Ex. 1 and 2.

- 22 -

*"Network" in the License Agreement, and the corresponding information set forth on Exhibit A to the License Agreement, HCA-IT&S understood and believed at all times that as long as the archived medical information that was stored on the MedArchive servers was available only to the MEDITECH System Networks, then HCA-IT&S was in compliance with the License Agreement. regardless of whether the MEDITECH System Network serviced Divested Facilities (as defined below in paragraph 17). Indeed, in January 2002, when BlueChip executed the License Agreement, some of the MEDITECH System Networks listed on Exhibit A were exclusively servicing Divested Facilities.*

Fitzgerald Aff., ¶ 12 . Moreover, if HCA-IT&S and BlueChip had discussed and agreed that HCA-IT&S could not provide services to the Divested Facilities, HCA-IT&S would not have purchased a MedArchive license and support for seventy-six (76) servers. Partlow Aff., ¶ 37. If the Divested Facilities had been excluded, HCA-IT&S would have purchased a MedArchive license and support for substantially fewer than the seventy-six (76) servers because HCA-IT&S would have been responsible for far less patient medical information. *Id.*

## B.   BlueChip Is Not Simply Increasing Its Prices, It Is Changing How It Charges For Support, In Violation Of The Support Agreement.

BlueChip has attempted to change the basic terms of the Support Agreement by charging HCA-IT&S an additional $83,201.00 per month for the Divested Facilities, which BlueChip erroneously claims are "unauthorized users." Partlow Aff., ¶ 43; Burton Aff., Ex. 13.[11] BlueChip's strained theory of "unauthorized users" – *i.e.*, that only users who are "affiliated" with HCA Inc. may use the software and all others are "unauthorized users" – assumes a "user-based" license and, therefore, is wholly inconsistent with the plain language of the License Agreement and Support Agreement. Burton Aff., Ex. 1. Moreover, the License Agreement does not differentiate between users who are affiliated with HCA Inc. and those who are not. *Id.* In

---

[11]   According to BlueChip, these "unauthorized users" are hospitals that are no longer affiliated with HCA. BlueChip calls them "HCA-Non-Affiliate." *Id.* at Ex. 13.

fact, the licensee under both the License Agreement and the Support Agreement is HCA-IT&S, not HCA Inc. *Id.*

BlueChip may argue that Section 2(f) of the License Agreement supports the view that only "HCA affiliates" are "authorized users." BlueChip is wrong. Section 2(f) does not even mention "affiliates" of either HCA Inc. or HCA-IT&S. Rather, Section 2(f) refers to the "Licensee's" (*i.e.*, HCA-IT&S') "employees, contractors, and consultants." Assuming, *arguendo*, that Section 2(f) is the applicable grant clause (which HCA-IT&S disputes), Section 2(f) would limit the users under the License Agreement to HCA-IT&S' "employees, contractors, and consultants."

Based on this limitation, it is improper to construe Section 2(f) as the grant clause because doing so would frustrate the commercial purpose of the License Agreement. *See, e.g., Garbincius v. Boston Edison Co.*, 621 F.2d 1171, 1177 (1st Cir. 1980) ("Contracts, where possible, are to be construed to reach a sensible result."); *Victory Bottle Capping Mach. Co. v. O. & J. Mach. Co.*, 280 F. 753, 759 (1st Cir. 1922) ("A contract must be construed as a whole and the intention of the parties is to be collected from the entire instrument, and not from detached portions; it being necessary to consider all of its parts in order to determine the meaning of every particular part as well as of the whole."); *Digital Equip. Corp. v. AltaVista Tech., Inc.*, 960 F. Supp. 456, 473 (D. Mass. 1997) ("[A] contract should be construed to give it effect as a rational business instrument and in a manner which will carry out the intent of the parties…[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.") (quoting *Starr v. Fordham*, 420 Mass. 178, 192 (1995)); 11 Samuel Williston, *A Treatise on the*

*Law of Contracts* § 32:9 (4th ed. 1999) ("[A] contract will be construed so as to effectuate rather than defeat the parties' intentions and purposes in entering the contract.).

HCA-IT&S is a service company that provides information technology and services to, among others, Hospitals that are owned by subsidiaries or affiliates of HCA Inc. Partlow Aff., ¶ 6. No employees of HCA-IT&S have any need to "use" the Supported Programs. *Id.* at ¶ 35. Instead, the MEDITECH System Networks – which support the Hospitals – "use" the Supported Programs to electronically access patient medical information. *Id.* Since the MEDITECH System Networks and Hospitals are not HCA-IT&S' "employees, contractors, and consultants," no one would be permitted to "use" the Supported Programs under BlueChip's interpretation of the License Agreement. *Id.*; *see also Victory Bottle Capping Mach. Co.*, 280 F. at 758 ("It is a maxim of the common law that one, granting a thing, impliedly grants that without which the thing expressly granted would be useless to the grantee.")[12]

BlueChip may also argue that it is simply increasing its prices by charging for "HCA-Non-Affiliates." Such an argument is misleading because BlueChip has already imposed a substantial annual price increase separate and apart from the charge for "HCA-Non-Affiliates." Burton Aff., Ex. 13. Effective July 1, 2005, BlueChip imposed substantial price increases on each of the Supported Programs, including a price increase of more than 15% over last year's price on the core product of MedArchive Support (and even though prior year increases for MedArchive support were approximately 5%), despite the fact that HCA-IT&S' support requirements have remained static, or decreased, since the parties entered into the Support Agreement in 2002, and despite the fact that this 15% increase relates only to what BlueChip

---

[12]  Even if Section 2(f) is the applicable grant clause, HCA-IT&S' use of the Supported Programs is still consistent with the License Agreement because HCA-IT&S does not "make [the Licensed Software] available" to the Hospitals as BlueChip claims. *Id.* at Ex. 1.

calls "HCA-Affiliates" – a subset of the group that BlueChip supported last year. Partlow Aff., ¶
43. Moreover, if BlueChip were simply "increasing prices" as it claims, there would be no
reason to create a new and separate line item on the invoice for "HCA-Non-Affiliates." Rather,
it would just increase prices, leaving the categories unchanged.

## C. HCA-IT&S Does Not "Make The Licensed Software Available" To The Hospitals.

Even if Section 2(f) is the applicable grant clause, HCA-IT&S' use of the Supported
Programs is consistent with the License Agreement because HCA-IT&S does not "make [the
Licensed Software] available" to the Hospitals as BlueChip claims. Burton Aff., Ex. 1 .
Healthcare providers who review electronic patient medical information have no access
whatsoever to MedArchive software code and no direct access to MedArchive, its functionality,
or the data stored on the MedArchive servers. Fitzgerald Aff., ¶ 11. Instead, the MEDITECH
System interacts with MedArchive on a machine-to-machine basis, without the healthcare
providers' knowledge. *Id.*

## D. There Is An Enforceable Support Agreement Between BlueChip And HCA-IT&S.

BlueChip has admitted in its Termination Notice that the Support Agreement governs the
parties' rights and responsibilities with regard to support for the Supported Programs. Burton
Aff., Ex. 16. Indeed, in its Termination Notice, BlueChip relies on "Section H(2) of the Master
Software Support Agreement" to claim that it is entitled to "increase its prices." *Id.* There
should be no dispute, therefore, that the parties have an enforceable agreement for support.

To the extent, however, that BlueChip changes its mind once again and claims that there
is no enforceable Support Agreement, the evidence is overwhelming that the parties have an
enforceable Support Agreement. *See* Partlow Aff, ¶ 39 , Fitzgerald Aff., ¶ 28, 29, 30; *see also
JOM, Inc. v. Adell Plastics, Inc.*, 193 F.3d 47, 54 (1st Cir. 1999) ("[W]here for any reason the

exchange of forms does not result in contact formation...a contract nonetheless is formed if [the parties'] subsequent conduct -- for instance, the seller ships and the buyer accepts the goods -- demonstrates that the parties believed that a binding agreement had been formed."); *i.LAN Sys., Inc. v. NetScout Serv. Level Corp.*, 183 F. Supp. 2d 328, 335 n.4 (D. Mass. 2002) ("A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.") (citing M.G.L. c. 106, § 2-204);[13] *Commerce & Indus. Ins. Co. v. Bayer Corp.*, 433 Mass. 388, 393 (2001) (finding contract under § 2-207(3) based on parties' conduct); *Novel Iron Works, Inc. v. Wexler Constr. Co.*, 26 Mass. App. Ct. 401, 407-08 (1988) (enforcing terms of unexecuted written contract).[14]

## E.   BlueChip Has Breached The Support Agreement And The Covenant Of Good Faith And Fair Dealing Inherent In The Support Agreement.

BlueChip has substantial leverage because HCA-IT&S is totally dependent upon BlueChip for support. Fitzgerald Aff., ¶ 33. BlueChip has repeatedly exploited its leverage, in violation of both the Support Agreement and the implied covenant of good faith and fair dealing, by threatening to terminate support unless HCA-IT&S pays an additional 220% based on a concocted theory of "unauthorized users" or converts to BlueChip's costly next generation software product (Object Archive) instead of technology offered by its competitor. Partlow Aff., ¶ 27; Burton Aff., Ex. 7 and 17; *see also Lawson v. Affirmative Equities Co., L.P.*, 341 F. Supp. 2d 51, 64 (D. Mass. 2004) (finding breach of implied covenant where defendants threatened to

---

[13]   The Support Agreement, like the License Agreement, is governed by the UCC because the provision of support is "merely incidental or collateral to" to the software provided under the License Agreement. *See, e.g., Dynamics Corp. of Am. v. Int'l Harvester Co.*, 429 F. Supp. 341, 346 (S.D.N.Y. 1977); *see also i.LAN Sys., Inc.*, 183 F. Supp. 2d at 336 (applying UCC to software license agreement); *Novacore Techs., Inc. v. GST Communications Corp.*, 20 F. Supp. 2d 169, 183 (D. Mass. 1998) (same); *VMark Software, Inc. v. EMC Corp.*, 37 Mass. App. Ct. 610 n.1 (1994) (same).

[14]   BlueChip apparently considers New Exhibit C to be part of the Support Agreement because it is attached to the Support Agreement that is attached to the Complaint as Exhibit 2.

- 27 -

cause execution against trust's assets if plaintiff trustee persisted in asserting the trust's contractual rights); *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 472-73 (1991) (finding breach of implied covenant where one party's actions were designed to "force financial concessions from" the other).[15]

BlueChip first threatened to disrupt support by claiming, on May 1, 2005, that there was no Support Agreement and trying to coerce HCA-IT&S into entering a new agreement. Burton Aff., Ex. 7.[16] BlueChip then attempted to manufacture a default by HCA-IT&S under the Support Agreement by charging HCA-IT&S for support that is already included in the Support Agreement. *Id.* The basis for these "new" charges is a disputed legal theory (*i.e.*, "unauthorized users") that is the very subject of BlueChip's Complaint. *Id.* Now, long before this lawsuit will be adjudicated, BlueChip is demanding payment from HCA-IT&S in an outrageous attempt to seek its damages up front. *See CMM Cable Rep., Inc.*, 48 F.3d at 620; *Teradyne, Inc.*, 797 F.2d at 52-53; *Fairview Mach. & Tool Co.*, 77 F. Supp. 2d at 205.

Further, the additional $83,201.00 per month that BlueChip seeks for "MedArchive Support" for "HCA-Non-Affiliates" bears no rational relationship to the actual support provided. HCA-IT&S has made precisely one (1) MedArchive-related support call to BlueChip since January 2004. Partlow Aff., ¶ 40; Fitzgerald Aff., ¶ 30; Burton Aff., Ex. 7.[17] By unilaterally and fundamentally changing how it charges for support under the Support Agreement, despite

---

[15] Among the reasons that HCA-IT&S has been reluctant to move to BlueChip's next generation product is that HCA-IT&S has had extreme difficulties with this product in Florida. Fitzgerald Aff. ¶¶ 29, 33.

[16] BlueChip later admitted, on May 20, 2005 and June 23, 2005, that the Support Agreement remained in place. Burton Aff., Ex 9, 16.

[17] BlueChip's new charge – which carries a 220% markup over existing rates – is completely disproportionate to the percentage of so-called "HCA-Affiliates" versus "HCA-Non-Affiliates" given that the majority of the Hospitals are affiliated with HCA and only some are Divested Facilities. Partlow Aff. ¶ 6. This fact alone demonstrates that its 220% mark-up is arbitrary, at best.

- 28 -

the fact that HCA-IT&S' support requirements have remained static, or decreased, since the

parties entered into the Support Agreement in 2002, BlueChip has acted in bad faith.

## III. THE BALANCE OF HARDSHIPS WEIGHS IN FAVOR OF HCA-IT&S BECAUSE THE HARM TO HCA-IT&S FROM BLUECHIP'S TERMINATION OF SUPPORT FOR THE SUPPORTED PROGRAMS IS FAR GREATER THAN ANY HARM THAT WILL BE CAUSED TO BLUECHIP BY A PRELIMINARY INJUNCTION.

As noted, the irreparable harm to HCA-IT&S from BlueChip's termination of support for

the Supported Programs, which must be presumed, is substantial. Brown Aff., ¶ 10. In contrast,

BlueChip can point to no comparable harm that would result if it is prevented from terminating

support to HCA-IT&S. Given that HCA-IT&S has paid, and will continue to pay, the undisputed

monthly charge, and HCA-IT&S' support requirements have remained static, or decreased, since

the parties entered into the Support Agreement in 2002, BlueChip's only potential harm is the

ongoing injury, if any, resulting from HCA-IT&S' alleged breach of contract. Partlow Aff.,

¶ 44; Fitzgerald Aff., ¶ 25; *Computer Assocs. Int'l, Inc.*, 789 F. Supp. at 472.

BlueChip's potential harm can be compensated by money damages. *Computer Assocs.*

*Int'l, Inc.*, 789 F. Supp. at 472. Moreover, the risk of even that harm can be avoided by requiring

HCA-IT&S to post reasonable security. *Id.*; *see also Fairview Mach. & Tool Co.*, 77 F. Supp. 2d

at 205 ("[A] district court retains substantial discretion to dictate the terms of an injunction

bond."); *Pro Am Sports Sys., Inc. v. Larry Simone, Inc.*, 738 F.2d 440 (6th Cir. 1984) (granting

preliminary injunction conditioned upon defendants' payment of customary fees into court).

**IV.    THE PUBLIC INTEREST SUPPORTS GRANTING A PRELIMINARY INJUNCTION BECAUSE BLUECHIP'S TERMINATION OF SUPPORT FOR THE SUPPORTED PROGRAMS WOULD JEOPARDIZE THE HEALTH AND SAFETY OF PATIENTS RECEIVING MEDICAL CARE AT THE HOSPITALS SERVED BY HCA-IT&S.**

The public interest is served by protecting the health and safety of patients receiving

medical care at the Hospitals served by HCA-IT&S. *See, e.g., Mediplex of Mass., Inc.*, 39 F.

Supp. 2d at 101 (maintaining the health and safety of nursing home residents is clearly in the

public interest); *Olson*, 281 F. Supp. 2d at 489 (continuing to provide medical services to

Medicaid recipients is in the public interest); *see also Computer Assocs. Int'l, Inc.*, 789 F. Supp.

at 473 ("There is no strong public interest in facilitating the immediate termination of

maintenance support, particularly since [the defendant] is in compliance with that portion of its

contracts with [the plaintiff] that calls for the payment of fees for support."); *Detroit Med. Ctr.*,

103 F. Supp. 2d at 1024 ("[T]he Court believes that the public's interest in receiving adequate

medical care outweighs its general interest in the performance of [computer license and

maintenance] agreements[.]"). Accordingly, the public interest will be served by the issuance of

the requested injunction.

## CONCLUSION

For the foregoing reasons, HCA-IT&S respectfully requests that the Court enter a

temporary restraining order and preliminary injunction to enjoin BlueChip from terminating

support for the Supported Programs and order such further relief as the Court deems just and

proper.

- 30 -

Respectfully submitted,

HCA-INFORMATION TECHNOLOGY
& SERVICES, INC.,
By its attorneys,

J. William Codinha, BBO No. 087740
Timothy W. Mungovan, BBO No. 600702
Deborah C. Burton, BBO No. 650737
Stephen M. LaRose, BBO No. 654507
NIXON PEABODY LLP
100 Summer Street
Boston, MA 02110
(617) 345-1000

Dated: June 27, 2005

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon Michael A.
Albert, Wolf, Greenfield & Sacks, PC, 600 Atlantic Ave., Boston, MA 02210 by hand, on June
27, 2005.

Stephen M. LaRose