IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUECHIP TECHNOLOGIES LTD.,

Plaintiff

v.

HCA-INFORMATION TECHNOLOGY &
SERVICES, INC.,

Defendant.

Civil Action No. 05-10784 JLT

### AFFIDAVIT OF TIMOTHY W. PARTLOW

I, Timothy W. Partlow, state as follows:

1. I am an adult resident of Tennessee and make this Affidavit based upon my own knowledge and my review of the business records of HCA-Information Technology & Services, Inc. ("HCA-IT&S").

2. I am a Vice President of HCA-IT&S and among my duties and responsibilities, I am responsible for the financial affairs of HCA-IT&S.

3. As a Vice President of HCA-IT&S, I am familiar with the business of HCA-IT&S and the history of the business relationship between BlueChip Technologies Ltd. ("BlueChip") and HCA-IT&S.

4. HCA-IT&S is a wholly-owned indirect subsidiary of HCA Inc. ("HCA"). HCA is a holding company whose affiliates or subsidiaries own, manage, or operate hospitals and other healthcare facilities, such as freestanding surgery centers and diagnostic and imaging centers.

5. HCA-IT&S licenses certain software programs from BlueChip and BlueChip provides support to HCA-IT&S in connection with those programs. Among the software programs that HCA-IT&S licenses from BlueChip, and that BlueChip supports, are the MedArchive software program ("MedArchive"), Object Archive and Medscan 2000 (Object

Archive and Medscan 2000 are, together, "Object Archive"). MedArchive and Object Archive facilitate the storage and retrieval of certain archived patient medical information by healthcare providers.

6. HCA-IT&S, as its name implies, provides information technology and services to hospitals and healthcare facilities (collectively, the "Hospitals"). Most of the Hospitals are owned, managed, or operated by HCA subsidiaries or affiliates, while some are not.

7. While HCA-IT&S provides services to the Hospitals, HCA-IT&S does not have an ownership interest in any of the Hospitals, and the Hospitals do not have an ownership stake in HCA-IT&S.

8. Among other things, HCA-IT&S provides a service to the Hospitals that enables physicians and other healthcare providers to electronically retrieve patient medical information. The software program that controls most of this electronic medical information and record keeping function is known as the MEDITECH Clinical Patient Care System (the "MEDITECH System"). Once patient medical information reaches a certain "age" in the MEDITECH System, it is electronically archived. While the "age" at which medical information is archived can vary, it is commonly archived on a rolling basis as early as forty-five (45) days from the patient's discharge date (for inpatient services) or service date (for outpatient services).

9. MedArchive works in tandem with the MEDITECH System to permit both the retrieval and long-term storage of archived patient medical information at the request of the MEDITECH System.

10. In the mid-1990's, Columbia/HCA Information Services (n/k/a HCA-IT&S) had an agreement with Data General Corporation ("Data General"), who at the time was the owner of MedArchive, pursuant to which Columbia/HCA Information Services could operate MedArchive

2

on servers in its eight data centers and Data General would provide support for MedArchive (the "Data General Agreement").

11. Beginning in the late 1990's, HCA began to pursue a strategy of divesting itself of certain hospitals and healthcare facilities. In May 1999, HCA completed the divestiture of the hospitals in two of its divisions. As a result, LifePoint Hospitals, Inc. ("LifePoint") and Triad Hospitals, Inc. ("Triad"), two independent companies, were created through a distribution of common stock to HCA's shareholders.

12. Following their divestiture, HCA has, through certain subsidiaries, continued to provide services to LifePoint and Triad. For example, from the time of their divestiture from HCA, HCA-IT&S has provided information technology and services to LifePoint and Triad, including the storage and retrieval of electronic archived patient medical information.

13. In addition to LifePoint and Triad, HCA has divested itself of other Hospitals. In some instances, HCA has, through certain subsidiaries, continued to provide services to these divested Hospitals, including information technology and services through HCA-IT&S (The divested Hospitals to which HCA-IT&S has continued to provide services are the "Divested Facilities").

14. In 1999, Data General was aware that HCA was planning to divest itself of certain hospitals and healthcare facilities and that, in certain instances, HCA-IT&S would continue to provide services, including information technology and services such as electronic record keeping of patient medical information, to the Divested Facilities on an ongoing basis.

15. Data General and HCA-IT&S agreed that, after the divestitures, HCA-IT&S would continue to pay the same licensing and support fees to Data General for all of Data General's products and services for which HCA-IT&S had paid prior to the divestitures. Thus, where HCA-IT&S continued to provide information technology and services to a divested

Hospital, HCA-IT&S would continue to pay the same fees to Data General that it paid before the divestiture, and Data General would not seek to charge the divested Hospital directly for these programs and support. Data General confirmed this agreement and understanding in an email from Data General to HCA-IT&S dated January 13, 1999. A true and accurate copy of this email is attached to the Affidavit of Deborah C. Burton, Esq. as Exhibit 3.

16. In December 2000 or January 2001, BlueChip purchased the MedArchive software product from EMC Corporation ("EMC"), which had recently purchased the assets of Data General.

17. In February 2001, at BlueChip's request, HCA-IT&S provided EMC and BlueChip with a list of its seventy-six (76) MedArchive servers, including market name and server model information. HCA-IT&S also explained that it did not know how many Hospitals were archiving per market or per MedArchive server.

18. Beginning on July 1, 2001, HCA-IT&S began to make monthly payments of $28,330.00 directly to BlueChip for support in connection with, among other things, MedArchive.

19. HCA-IT&S subsequently entered into two agreements with BlueChip concerning the use and support of certain software programs: the Software License Agreement (the "License Agreement") and the Master Software Support Agreement (the "Support Agreement"). True and accurate copies of these agreements are attached to the Affidavit of Deborah C. Burton, Esq. as Exhibits 1 and 2, respectively. BlueChip drafted both of these Agreements and BlueChip insisted that its form of Agreements must govern the parties' relationship. BlueChip also declined to make any changes to its Agreements. HCA-IT&S executed both of these Agreements on December 6, 2001. BlueChip executed both of these Agreements on or about January 3, 2002.

20. The License Agreement governs the use of various BlueChip software programs, which are listed on Exhibit B to the License Agreement (the various software products covered by the License Agreement are, together, the "Licensed Software"). MedArchive is included among the Licensed Software listed in Exhibit B. The specific servers on which HCA-IT&S is authorized to run MedArchive are listed in Exhibit A to the License Agreement. Exhibit A lists seventy-six (76) servers and identifies them by, among other things, the "market network," "time zone," and "serial number."

21. The Support Agreement concerns BlueChip's obligations to provide support to HCA-IT&S in connection with the Licensed Software. Exhibit C to the License Agreement is entitled "Supported Programs" and identifies each of the programs for which BlueChip agreed to provide support (the "Supported Programs") and the cost of support for each program. Exhibit C also identifies the quantity (as stated in the agreement: "QTY") of each of the Supported Programs and the "Unit Charge" for each Supported Program.

22. With respect to MedArchive , Exhibit C lists the quantity of Supported Programs as "76" and the Unit Charge as $330.00 per month. Based on the number of servers operating MedArchive, and the per Unit Charge for each server, the monthly charge for support for MedArchive on all seventy-six (76) servers was $25,080.00. Because the total monthly cost of support for all of the Supported Programs in 2002 was $28,330.00, the cost of support for MedArchive comprised almost 90% of the total cost of support for the Supported Programs.

23. Beginning in January 2002, BlueChip provided support to HCA-IT&S pursuant to the Support Agreement. In July 2002, BlueChip increased the total monthly cost of support for the Supported Programs to $29,747.00. In July 2003, BlueChip increased the total monthly cost of support for the Supported Programs to $30,936.36.

24. In May and June of 2003, the archive solution for HCA-IT&S' Jacksonville, Florida market was migrated to a new server and the software was converted to Object Archive (the "Jacksonville Server").

25. Since May 2003, BlueChip has been providing support for Object Archive (in addition to MedArchive) pursuant to the Support Agreement and HCA-IT&S has been paying for such support.

26. Each month from January 2002 to May 2005, BlueChip has sent an invoice to HCA-IT&S for the next month's support, and HCA-IT&S has paid the invoice in a timely fashion. True and accurate copies of the invoices that BlueChip sent to HCA-IT&S through May 2005 are attached to the Affidavit of Deborah C. Burton, Esq. as Exhibit 4. True and accurate copies of the checks that HCA-IT&S used to make payment on each invoice through May 2005 are attached to the Affidavit of Deborah C. Burton, Esq. as Exhibit 5.

27. During February, March, and April 2004, BlueChip and HCA-IT&S engaged in discussions concerning the future of their business relationship. BlueChip wanted HCA-IT&S to replace MedArchive with the next generation software product (Object Archive) that would have also required HCA-IT&S to purchase new servers on which to operate the software. Meanwhile, HCA-IT&S informed BlueChip that HCA-IT&S was considering replacing BlueChip's software with technology offered by a competitor.

28. In March 2004, BlueChip informed HCA-IT&S that BlueChip wanted to end its support for MedArchive, but BlueChip offered to continue to provide support for MedArchive if HCA-IT&S would commit to a multi-year extension of the Support Agreement through December 31, 2006. At that time, BlueChip also provided HCA-IT&S with a new Exhibit C to the License Agreement, entitled "Exhibit C Software Support Price Schedule" ("New Exhibit C"). Based on subsequent discussions and written communications between HCA-IT&S and

6

BlueChip in March and April, HCA-IT&S understood and believed that BlueChip offered to continue to provide support to HCA-IT&S for MedArchive if HCA-IT&S would agree to extend the Support Agreement through December 31, 2006. Accordingly, on or about May 28, 2004, HCA-IT&S executed New Exhibit C. A true and accurate copy of New Exhibit C is attached to the Affidavit of Deborah C. Burton, Esq. as Exhibit 2 (last page of the exhibit).

29. New Exhibit C provides in part that the parties agree "to an extended contract term beginning April 1, 2004 and ending December 31, 2006." New Exhibit C further states that "The pricing listed above is effective July 1, 2004 through June 30, 2005 and is subject to a limited annual price increase on the anniversary date, in accordance with the Master Software Support Agreement (#BCT 601 dated 12/06/01)."

30. Pursuant to New Exhibit C, BlueChip increased the price of support for MedArchive to $28,828.43 per month and the total monthly price for all Supported Programs to $32,564.23. Thus, the monthly cost of support for MedArchive continued to comprise almost 90% of the total monthly charge for all of the Supported Programs.

31. Pursuant to New Exhibit C, each month from June 2004 to April 2005, BlueChip has sent an invoice to HCA-IT&S seeking payment of $32,564.23 for the next month's support. Each month, HCA-IT&S has paid these invoices.

32. In December 2004, BlueChip claimed for the first time that HCA-IT&S was violating the License Agreement by permitting the Divested Facilities to access archived data stored on the MedArchive servers.

33. From the very beginning of its relationship with BlueChip, HCA-IT&S always understood and believed that it had agreed with BlueChip that HCA-IT&S could provide information technology services to the Hospitals – including the Divested Facilities – under the terms of the License Agreement and Support Agreement. In other words, based on the terms of

the License Agreement itself, together with Exhibit A and Exhibit C, HCA-IT&S believed that it had a server-based License Agreement and Support Agreement; that is, BlueChip was charging HCA-IT&S for support for MedArchive based on the number of servers that were operating MedArchive, not the number of hospitals or healthcare providers to which HCA-IT&S was providing information technology services.

34. In addition, HCA-IT&S understood and believed that it had agreed with BlueChip that the License Agreement and Support Agreement, and the pricing terms in those agreements, enabled HCA-IT&S to provide information technology and services, including access to the archived patient medical information on the MedArchive servers, to the Divested Facilities such as LifePoint and Triad. In short, HCA-IT&S understood and believed that it had an agreement with BlueChip that the basic pricing structure with BlueChip was the same as it had been with Data General, and that HCA-IT&S would be able to continue to provide services to the Divested Facilities at no additional cost over and above the payments made pursuant to the License Agreement and Support Agreement.

35. This understanding and belief was based in part on:

- HCA-IT&S' agreement with Data General;
- Data General's performance under the Data General Agreement;
- The parties' performance beginning in July 2001 when BlueChip began to invoice HCA-IT&S for support and HCA-IT&S continued to provide services to the Divested Facilities;
- The parties performance since January 2002 when BlueChip executed the License Agreement and Support Agreement and HCA-IT&S continued to provide services to the Divested Facilities; and

- HCA-IT&S' specific discussions with BlueChip, both before and after the execution of the License Agreement and Support Agreement, that HCA-IT&S planned to continue to divest itself of certain facilities and that it intended to provide information technology and services, including access to the archived patient medical information on the MedArchive servers, to these facilities after their divestiture.

36. HCA-IT&S understanding and belief that it could continue to service the Divested Facilities was also based in part on the fact that HCA-IT&S, <u>not</u> HCA, was the licensee under both the License Agreement and Support Agreement. As an information technology and service company within HCA, HCA-IT&S does not employ any physicians or healthcare providers who would have any need to "use" MedArchive. Rather, HCA-IT&S – as its name makes clear – provides information technology and services to hospitals and healthcare facilities who do need to "use" MedArchive. There would have been no purpose to HCA-IT&S purchasing licenses and support from BlueChip if HCA-IT&S could not in turn provide information technology and services to the Hospitals.

37. Furthermore, <u>if</u> HCA-IT&S and BlueChip had discussed and agreed that HCA-IT&S could not provide services to the Divested Facilities, HCA-IT&S would not have purchased a MedArchive license and support for seventy-six (76) servers. <u>If</u> the Divested Facilities had been excluded, HCA-IT&S would have purchased a MedArchive license and support for substantially fewer than the seventy-six (76) servers because HCA-IT&S would have been responsible for far less patient medical information.

38. Notwithstanding BlueChip's claims, in December 2004, that HCA-IT&S was violating the terms of the License Agreement, BlueChip continued to send monthly invoices for

$32,564.00 to HCA-IT&S for support for the Supported Programs, HCA-IT&S continued to pay these invoices, and BlueChip continued to provide support for the Supported Programs.

39.   On May 1, 2005, BlueChip sent a letter to HCA-IT&S claiming for the first time that the Support Agreement expired on June 30, 2004 and that HCA-IT&S was "in an 'at-will' relationship" with BlueChip for support.  A true and accurate copy of this letter is attached to the Affidavit of Deborah C. Burton, Esq. as Exhibit 7.  BlueChip also claimed for the first time that it had not agreed to extend the Support Agreement through December 31, 2006 pursuant to New Exhibit C based on the alleged disagreement over "unauthorized users" that BlueChip had raised in December 2004.  BlueChip made this assertion despite the fact that:

- BlueChip provided New Exhibit C to HCA-IT&S in March 2004;
- BlueChip received an executed copy of New Exhibit C from HCA-IT&S in May 2004;
- BlueChip never told HCA-IT&S that it had withdrawn New Exhibit C or otherwise rejected New Exhibit C;
- From June 1, 2004 to April 1, 2005, BlueChip sent monthly invoices to HCA-IT&S for $32,564.23, precisely the amount of the "Total Monthly Charge" set for in New Exhibit C;
- BlueChip did not even raise the claim of "unauthorized users" until December 2004 – more than six months after BlueChip and HCA-IT&S had performed in accordance with New Exhibit C; and
- BlueChip has provided support services to HCA-IT&S continuously from July 2001 through the present.

40.   In its May 1, 2005 letter, BlueChip also claimed for the first time that it was entitled to charge HCA-IT&S for support for the Divested Facilities – which BlueChip

considered "unauthorized users." BlueChip also attached to its letter yet another new version of "Exhibit C" – this one for a "One Year Support Agreement Effective: June 1, 2005 to May 31, 2006." This latest Exhibit C distinguished between what BlueChip termed "HCA Affiliates" and "HCA-Non-Affiliates." BlueChip also sought an additional monthly payment of $83,201.00 from HCA-IT&S for "MedArchive Support" for "HCA-Non-Affiliates."

41.   HCA-IT&S responded to BlueChip's May 1, 2005 in a letter dated May 19, 2005 and explained, among others things, that it believed that the Support Agreement remained in force and that BlueChip had no right to impose additional charges for support for the Divested Facilities under the terms of the License Agreement and Support Agreement. HCA-IT&S also explained that, under the terms of the Support Agreement, BlueChip could not increase its prices without giving sixty days written notice. A true and accurate copy of this letter is attached to the Affidavit of Deborah C. Burton, Esq. as Exhibit 8. On May 20, 2005, BlueChip responded to HCA-IT&S' letter dated May 19, 2005 and now, rather than claiming that the Support Agreement had expired (as it had done in its May 1, 2005 letter), BlueChip claimed that HCA-IT&S was "in material breach" of the "Master Software Support Agreement" by, among other things, "threatening to materially breach its support and maintenance agreement contract with BlueChip by failing to timely pay for support and maintenance services." BlueChip then repeatedly invoked the terms of the Support Agreement to justify its price increases for support, which now BlueChip said would be effective on July 1, 2005. A true and accurate copy of this letter is attached to the Affidavit of Deborah C. Burton, Esq. as Exhibit 9. BlueChip also issued a new invoice to HCA-IT&S seeking payment of $32,564.00 for support for the period of June 1 to June 30, 2005. A true and accurate copy of this invoice is attached to the Affidavit of Deborah C. Burton, Esq. as part of Exhibit 10. HCA-IT&S then paid this invoice with a check

11

in the amount of $32,564.00. A true and accurate copy of this check is attached to the Affidavit of Deborah C. Burton, Esq. as part of Exhibit 11.

42.     On May 31, 2005, HCA-IT&S responded to BlueChip's letter dated May 20, 2005 explaining that, among other things, HCA-IT&S would seek immediate legal relief if BlueChip attempted "to terminate support prematurely or otherwise interfere with HCA-IT&S' use of the Licensed Software" because such actions "could jeopardize the health and safety of patients receiving medical care at the facilities served by HCA-IT&S." A true and accurate copy of this letter is attached to the Affidavit of Deborah C. Burton, Esq. as Exhibit 12.

43.     On June 1, 2005, BlueChip issued an invoice to HCA-IT&S seeking a total payment of $121,325.00 for support for the Supported Programs for the time period of July 1, 2005 to July 31, 2005. BlueChip sought a monthly payment of $83,201.00 for "MedArchive Support" for what it called "HCA-Non-Affiliates." BlueChip also listed separate charges for each of the Supported Programs, including a charge for "MedArchive Support" for what BlueChip called "HCA-Affiliates." In addition to the fact that it sought to charge HCA-IT&S for support for "HCA-Non-Affiliates," BlueChip also imposed substantial price increases on each of the Supported Programs, including a price increase of more than 15% over last year's price on the core product of MedArchive Support (and even though prior year increases for MedArchive support were approximately 5%). A true and accurate copy of this invoice is attached to the Affidavit of Deborah Burton as Exhibit 13.

44.     On June 17, 2005, HCA-IT&S issued a payment of $38,124.00 as full payment on BlueChip's invoice dated June 1, 2005. In a letter that HCA-IT&S sent to BlueChip along with its payment, HCA-IT&S explained that the payment covered each of the Supported Programs and BlueChip's price increases. HCA-IT&S further explained that it objected to BlueChip's attempts to charge HCA-IT&S for what BlueChip called "HCA-Non-Affiliates" and declined to

pay such charges. True and accurate copies of this check and letter are attached to the Affidavit of Deborah C. Burton, Esq. as Exhibits 14 and 15, respectively.

45.     On June 22, 2005, BlueChip sent a letter to HCA-IT&S dated June 23, 2005. A true and accurate copy of this letter is attached to the Affidavit of Deborah C. Burton, Esq. as Exhibit 16. In its letter, BlueChip demanded payment of an additional $83,201.00 by July 5, 2005. BlueChip further stated that if HCA-IT&S does not pay this disputed amount of $83,201.00 by July 5, 2005 then "BlueChip intends to exercise its rights and suspend performance under the Master Software Support Agreement." Based on this letter, HCA-IT&S understands and believes that BlueChip will suspend or terminate support for all Supported Programs, including MedArchive and Object Archive, on July 5, 2005.

Signed under the pains and penalties of perjury of this 24th day of June 2005.

_____
Timothy W. Partlow

## CERTIFICATE OF SERVICE

I, Stephen LaRose, hereby certify that on June 27, 2005, I caused a true and accurate copy of the above affidavit to be served upon counsel for Plaintiff by hand.

_____